**STATE of Utah, Plaintiff and Appellee,**

v.

**John Timothy SINGER, Defendant and Appellant.**

No. 890081–CA.

Court of Appeals of Utah.

July 17, 1991.

G. Fred Metos (argued), Yengich, Rich, Xaiz & Metos, Salt Lake City, for appellant.

R. Paul Van Dam, Atty. Gen., C. Horton, II, Asst. Atty. Gen. (argued), Salt Lake City, for appellee.

Before BILLINGS, GARFF and ORME, JJ.

## OPINION

ORME, Judge:

Defendant John Timothy Singer appeals from a conviction for manslaughter, a sec-ond degree felony. Singer claims the evidence was adequate to support a conviction of negligent homicide, yet insufficient to support a conviction for the more serious offense of manslaughter. Singer also alleges that certain statements made by him were obtained in violation of his Fifth Amendment right against self-incrimination. We reject both arguments and affirm.

## FACTS

Before dawn on January 16, 1988, a loud explosion and accompanying tremors of unknown origin occurred in Marion, Utah, in rural Summit County. Later that morning, the custodian for a local church discovered that the church building had been damaged. A police detective investigated and found a carved staff, near the sight of what proved to be a bomb blast. The staff was painted red, adorned with feathers, and engraved with the motto, "J.S.—JAN. 18 1979—CHURCH—STATE—NATION WILL BE DESTROYED."

The initials "J.S." represented "John Singer," father of the defendant and self-styled prophet, who was killed at his ranch in Marion during an arrest attempt on January 18, 1979, the date carved into the staff. The family, now guided by John Singer's widow, Vicki Singer, and son-in-law, Addam Swapp, still resided at the Marion ranch. Addam Swapp later admitted to bombing the church. *State v. Swapp*, 808 P.2d 115, 116 n. 1 (Utah App.1991). Family members believed that destruction of the church house would precipitate the resurrection of John Singer. After the bombing, Addam Swapp declared the Singer ranch to be an independent nation, and the heavily-armed family barricaded itself in the main residence of the ranch. Addam Swapp and Vicki Singer were indicted by a federal grand jury for their part in the bombing and warrants were issued for their arrest and for search of the Singer ranch. A thirteen-day siege by state and federal law enforcement officials followed.

During the siege, Addam Swapp, his brother Jonathan, and the defendant fre-

quently ventured outside the home as they attended to farm chores, such as milking the family goat, and monitored the movements and positions of law enforcement officers. Each, including the wheelchair-bound defendant,[1] was heavily armed during these brief forays. Due to the presence of a number of children in the Singer home, law enforcement officials hoped to persuade the Singers to terminate the siege and surrender without violence. Lights and loudspeakers were utilized in an attempt to confuse and tire the Singers. The Singers responded by disabling the equipment, even leaving the confines of the ranch to do so. The officials' attitude of restraint ultimately led to deployment of police service dogs and their handlers in execution of a plan calculated to arrest Addam Swapp without gunfire.[2]

Under the cover of darkness, agents of the Utah State Corrections Police Service Dog Team and the Federal Bureau of Investigation Hostage Rescue Team took position in a nearby structure, known as the Bates house, bordering the west side of the Singer ranch. The Swapp brothers had earlier been seen in the Bates house. Officials hoped that agents would be able to isolate and peaceably arrest the Swapps if they made a repeat visit to the Bates house. Later the plan was modified to direct the police service dogs to take the Swapp brothers to the ground as they left the Singer house to milk the goat. On January 28, 1988, Corrections Lieutenant Fred House and Officer Jerry Pope positioned themselves with their dogs at the front door of the Bates house in order to release and command their dogs. Lieutenant House was crouched in the doorway, his right side slightly exposed to the Singer house. Other agents stood nearby to provide support for the dog handlers.

As the Swapp brothers approached the goat pen, the dogs were released. A nearly simultaneous series of events ensued. A burst of shots was fired from the Singer house. The dogs became confused and failed to key on the brothers. Addam Swapp shouldered his weapon and took aim at the officers. Officers fired at Addam Swapp and he was wounded with a single gunshot to the wrist. He quickly retreated into the Singer house. Lieutenant House was struck and felled by gunshots. The dogs reentered the Bates house through the front door and a second series of shots rang out from the Singer house. Agents pulled Lieutenant House further into the Bates house and attempted first aid. Lieutenant House did not respond and was pronounced dead on arrival following evacuation by helicopter to the University of Utah Medical Center.

Immediately after the shooting stopped, Addam Swapp walked out of the Singer house to surrender, although family members called to him to return. With the surrender of Addam Swapp, the remainder of the family quickly followed suit. Singer was taken into custody by agents of the Bureau of Alcohol, Tobacco and Firearms and transported to detention facilities in Salt Lake City.

A search of the Singer house revealed twenty-three firearms and over 8,000 rounds of ammunition cached at various points around the house. Two .30 caliber rifles were located near the window of Timothy Singer's bedroom. One of these rifles was later identified as the weapon from which the shots directed at the Bates house were fired, including the fatal shot to Lieutenant House.

Subsequent to his arrest and administration of *Miranda* warnings, Singer waived his constitutional rights to counsel and to remain silent, began to talk, changed his mind and invoked his right to remain silent, and then talked again. Singer was interviewed and gave a statement admitting he was seated in his wheelchair at his bedroom window when the Swapp brothers went out to milk the goat. Singer admitted

---

**1.** Defendant was paralyzed four years earlier in a tree-felling accident.

**2.** Officials believed that Addam Swapp was the family's leader and that his capture would lead to a prompt capitulation by other family members. Ultimately, this belief proved to be accurate.

to firing his rifle in the direction of the dogs and the Bates house, but denied firing at any officers, although he admitted he knew handlers would not be far from the dogs. Singer was charged with second degree murder. He was tried by a jury, which was instructed on second degree murder, as well as on the lesser offenses of manslaughter and negligent homicide. The jury convicted Singer of manslaughter and he was sentenced to a term of one-to-fifteen years in the state prison, to run consecutively to his federal sentences.[3]

## STANDARD OF REVIEW

■ An appellant challenging the sufficiency of the evidence faces a difficult task. When reviewing whether evidence is sufficient to support a jury conviction,

we review the evidence and all inferences which may be reasonably drawn from it in the light most favorable to the verdict of the jury. We reverse a jury conviction for insufficient evidence only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted.

*State v. Petree*, 659 P.2d 443, 444 (Utah 1983). Even if the defendant presents some competent contradictory evidence, we do not find facts anew. *See State v. Hopkins*, 782 P.2d 475, 477 (Utah 1989). Our scope is strictly limited to determining whether there was evidence to reasonably support each element of the charged offense, and we must "assume that the jury

believed those portions of the evidence supporting the verdict." *State v. Stewart*, 729 P.2d 610, 611 (Utah 1986).

## SUFFICIENCY OF THE EVIDENCE

Singer asks this court to reverse his conviction for manslaughter, admitting, however, that the evidence would support a conviction for negligent homicide. Under a charge of manslaughter, the prosecution must prove one of three alternative theories of culpability. The manslaughter statute provides:

Criminal homicide constitutes manslaughter if the actor:

(a) recklessly causes the death of another; or

(b) causes the death of another under the influence of extreme emotional disturbance for which there is a reasonable explanation or excuse; or

(c) causes the death of another under circumstances where the actor reasonably believes the circumstances provide a legal justification or excuse for his conduct although the conduct is not legally justifiable or excusable under the existing circumstances.

Utah Code Ann. § 76–5–205(1) (1990).[4] Singer claims the evidence was insufficient to establish that he acted recklessly in causing the death of Lieutenant Fred House. He claims he was merely negligent and thus should only have been convicted of negligent homicide: "Criminal homicide constitutes negligent homicide if the actor, acting with *criminal negligence*, causes the death of another." Utah Code Ann. § 76–5–206(1) (1990) (emphasis added).[5]

---

**3.** Defendant was convicted of the federal crimes of attempted second degree murder, 18 U.S.C. § 1114 (1988), resisting or assaulting a federal officer, 18 U.S.C. § 111 (1988), and two counts of using a firearm during a crime of violence, 18 U.S.C. § 924(c)(1) (1988). These charges also arose out of the 13–day encounter with law enforcement officers. Defendant was sentenced to 10 years in federal prison for these crimes.

**4.** "Recklessness" is defined as:

A person engages in conduct ... [r]ecklessly, or maliciously, with respect to the circumstances surrounding his conduct or the result of his conduct when he is aware but consciously disregards a substantial and unjustifi-

able risk that the circumstances exist or will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

Utah Code Ann. § 76–2–103(3) (1990).

**5.** "Criminal negligence" is defined as

A person engages in conduct ... [w]ith criminal negligence or is criminally negligent with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the

Thus, the sufficiency of the evidence proving the mental state required for manslaughter, as opposed to negligent homicide, forms the nucleus of Singer's challenge.

In *State v. Dyer*, 671 P.2d 142 (Utah 1983), the defendant and his brother, both of whom were intoxicated, argued and fought over car keys. Dyer produced a rifle which discharged in the direction of his brother. The bullet missed his brother, but traveled through the wall and struck and killed a friend standing outside the room. Evidence established that, although the gun had been modified by a gunsmith, the gun could not be fired without pulling the trigger. Dyer was tried for manslaughter, but convicted of the lesser offense of negligent homicide. Dyer claimed the evidence was insufficient to show that he acted with criminal negligence. Reviewing the evidence introduced at trial, the Utah Supreme Court disagreed and affirmed Dyer's conviction. The Court stated:

> The only difference between reckless and criminally negligent conduct is that under the former, one perceives a risk and consciously disregards it, whereas under the latter, one fails to even perceive the risk. The risk in both cases must be of such a degree that an ordinary person would not disregard or fail to recognize it. The distinction, then, is merely one of the degree of perception of the risk.

*Dyer*, 671 P.2d at 148. Thus, the critical distinction to be reached between recklessness and criminal negligence is the measure of perception of the risk leading to the victim's death.

The distinction is not capable of precise definition.

> The difference between [criminal] negligence and recklessness is not marked by a sharp analytical line. On the contrary, the difference generally lies in making a judgment as to where on a continuum of

result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would

unreasonable conduct one's behavior passes from negligence to recklessness. In essence it is a matter of judging when conduct is no longer just gray but dark gray.

*Boggess v. State*, 655 P.2d 654, 658 (Utah 1982).

When considering a manslaughter charge, the degree of defendant's perception of the risk presents a conjecture-laden inquiry, involving both objective and subjective elements. *State v. Wessendorf*, 777 P.2d 523, 525–26 (Utah App.), *cert. denied*, 781 P.2d 878 (Utah 1989). The jury must not only determine the defendant's subjective intent, but must also decide whether an ordinary person who was aware of the risk would act in spite of the risk. *Id.* A defendant can fairly be expected to testify that he or she was possessed of the most innocuous subjective intent when he or she committed the unlawful act. However, in resolving the question of defendant's subjective intent, the jury is not limited to consideration of the defendant's testimony. It is within the province of a properly instructed jury to consider all evidence admitted at trial and then decide whether the defendant acted recklessly. *See State v. Velarde*, 734 P.2d 449, 454 (Utah 1986) ("it remains within the prerogative of the jury to make the determination whether the defendant lacked the intent"); *State v. Howard*, 597 P.2d 878, 881 (Utah 1979) (distinction between requisite intent for manslaughter and negligent homicide is "a question of fact to be decided by the jury").

Singer claims the evidence does not establish that he was aware of a risk to human life when he fired the rifle at the police service dogs. He claims he had no reason to know of the officers' presence in the Bates house. Singer argues that the officers directing the police dogs entered the Bates home under the cover of darkness and through a window not directly visible from the Singer home. He also points out that the Swapp brothers had

exercise in all the circumstances as viewed from the actor's standpoint.

Utah Code Ann. § 76–2–103(4) (1990).

entered the Bates home earlier and found the home unoccupied during those visits.

Singer asserts he was only shooting at the police service dogs running about the property, in the belief that they posed a threat to the Swapp brothers. The State countered this claim with evidence that Singer's second volley resulted in a tight pattern of shots centered on the door frame. This group of shots was fired while the dogs were still wandering in the open field between the Singer and Bates homes. All four shots struck at a potentially lethal height.[6] Perhaps even more significant was the timing of the shots, demonstrated in a videotape of the encounter shown to the jury. The first three shots were fired in rapid sequence, and were answered by officers' gunfire as Addam Swapp simultaneously prepared to fire upon the officers. The second group of shots followed in measured beats, evenly spaced with sufficient time between them to allow for reacquisition of the target. The jury could have reasonably inferred a measure of deliberation of aim from this evidence, and equally discredited Singer's claim that he was only aiming at the dogs.

The nature of Singer's purported targets themselves, police service dogs, refutes his claim of "only" shooting at dogs. These dogs were not of the wandering neighborhood variety—they were obviously police service dogs who could not reasonably be believed to be casually roaming independent of a human handler. Singer saw the open door at the Bates house and admitted the dogs must have come from the house. Singer stated that he believed the shots which preceded his came from the Bates house, and conceded that the door through which the dogs were released must have been opened and closed by a person in the Bates house.[7]

The State introduced additional evidence supporting a conclusion that Singer acted recklessly, even if the jury stopped short of concluding that Singer was subjectively aware of the officers in the Bates house. Diagrams and photographs of the Singer ranch and surrounding properties were presented at trial to illustrate the sequence of events during the siege. Near the Bates property, separated by a small open patch, were several other homes. The Jepsen home bordered the Bates house on the west side, with the Singer property on the east. During the course of the thirteen-day standoff, and after evacuation of area residents, officers used the Jepsen house and were clearly visible as they moved about the Jepsen property. The State offered testimony that members of the Singer clan had observed law enforcement officers moving about the Jepsen property during the siege. The proximity of the Bates and Jepsen homes is such that any shots fired at or in the direction of the Bates home, but missing their target—including shots fired at wandering animals—would likely strike the Jepsen home. Only shots fired at an extreme angle to the rear of the Bates property would not traverse the plane of the Jepsen property. The jury could have reasonably concluded that shots fired even generally towards the Bates house were fired recklessly since they could easily reach the occupied Jepsen property.

We confine our review of the evidence to determining whether the evidence was "sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt" that defendant acted recklessly in shooting his rifle and causing the death of Lieutenant House. *Petree*, 659 P.2d at 444. Assuming the jury believed the evidence suggest-

6. Singer argues that the level of the shots was affected by an errant gunsight and if Singer's rifle sight had been properly adjusted for the distance between the Bates home and his firing point, the level of the shots would have more nearly approximated the height of the dogs' heads, Singer's claimed targets. Testimony of this sort is highly speculative, and the jury could have reasonably rejected it. An equally speculative, yet equally plausible, explanation for the height of the shots is that, correctly supposing the officers to be equipped with bullet-resistant vests, Singer aimed into the doorway at a height approximating the unprotected groin area.

7. Singer argues that any statements regarding his awareness of the presence of officers in the Bates house were taken in violation of his right to silence. We treat this claim in the following section.

ing Singer's awareness of persons within his line of fire, as we must, *Stewart,* 729 P.2d at 611, we do not find that the evidence of recklessness was "sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt" that Singer acted recklessly. *Petree,* 659 P.2d at 444. Questions of intent are strictly within the province of the jury and the jury was not required to accept that Singer was merely plinking at the police service dogs unaware of any risk to human life. *Velarde,* 734 P.2d at 454; *Howard,* 597 P.2d at 881. Accordingly, we hold the evidence of Singer's recklessness to be sufficient to support a conviction of manslaughter for the death of Lieutenant Fred House.

## SUPPRESSION OF CONFESSION

■ Singer claims the trial court erred in refusing to suppress certain statements made in the course of his conversations with officers transporting him from the Singer ranch to detention in Salt Lake City.[8] He claims that his confession was given both involuntarily and in violation of the requirement to scrupulously honor his decision to remain silent. Singer does not allege that the conversation during which he offered incriminating evidence was inherently coercive. Rather, he argues that his confession was involuntary due to his peculiar personal characteristics. Singer's claims are premised entirely on the federal constitution. We therefore confine our analysis to federal law. *See State v. Bobo,* 803 P.2d 1268, 1272 & n. 5 (Utah App.1990).

### A. Voluntariness of Singer's Confession

■ The "ultimate issue of 'voluntariness' [of a confession] is a legal question." *Arizona v. Fulminante,* — U.S. —, 111 S.Ct. 1246, 1252, 113 L.Ed.2d 302 (1991) (quoting *Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 449–50, 88 L.Ed.2d 405 (1985)). We review the totality of the circumstances to determine the voluntariness of a confession.[9] *State v. Strain,* 779 P.2d

8. We note that the only piece of incriminating evidence which resulted from Singer's recounting of the siege as he traveled to Salt Lake City, and which arguably could not have been proven in alternate fashion, was his admission that he knew the police service dogs were accompanied by human handlers. This evidence tended to show recklessness in firing the rifle. Any error in admission of this statement was probably harmless. *See generally Arizona v. Fulminante,* — U.S. —, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

We deem a trial error harmless when we "may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *State v. Tillman,* 750 P.2d 546, 555 (Utah 1987) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986)); *State v. Bartley,* 784 P.2d 1231, 1237 (Utah App.1989). Thus, if after excising the challenged evidence, we remain convinced that a conviction would have followed, we find the lower court's ruling to be harmless error.

After arriving in Salt Lake City, Singer was interviewed by investigators from the Utah Attorney General's Office. Prior to the interview, they readministered the *Miranda* admonition and Singer once again acknowledged that he understood his rights and would answer the investigator's questions. In the course of this more formal and ordered interrogation, Singer made statements showing his awareness of the officers and agents in the Bates house. It is possible the second confession would be admis-

sible under such circumstances even if the first were not. *See, e.g., Martin v. Wainwright,* 770 F.2d 918, 929 (11th Cir.1985), *cert. denied,* 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986).

In any event, the evidence supporting recklessness was not limited to Singer's stated awareness of officers' presence in the Bates house. The jury was also shown photographs and diagrams demonstrating that Singer's gunshots would likely penetrate into areas visibly occupied by officers and others. The jury could have easily relied on this evidence to conclude that Singer acted recklessly.

9. Singer argues that among the factors in our review we must examine the "age and intelligence of the witness, the place and conditions under which the statement was made, the circumstances that invoked the conversation, as well as the nature, content, and import of the statement itself." *State v. Johnson,* 95 Utah 572, 83 P.2d 1010, 1013 (1938), *overruled on other grounds, State v. Crank,* 105 Utah 332, 142 P.2d 178 (1943).

Singer also claims we must specifically weigh personal characteristics beyond his intelligence level, including his state of mind during the questioning, and prior experiences with police officers. He relies on *State v. Hunt,* 607 P.2d 297, 300–01 (Utah 1980). We note that the discussion in *Hunt* was focused on the capacity of a juvenile defendant to waive his or her rights. Although Singer claims to be mildly retarded and to function at a juvenile level, we

221, 225 (Utah 1989). In *Miller,* the United States Supreme Court held that confessions may be involuntary "when the interrogation techniques were improper only because, in the particular circumstances of the case, the confession is unlikely to have been the product of a free and rational will." *Miller,* 474 U.S. at 110, 106 S.Ct. at 449–50. *See also State v. Hegelman,* 717 P.2d 1348, 1350 (Utah 1986) ("Evidence sufficient to support a finding that a confession is involuntary must reveal some physical or psychological force or manipulation that is designed to induce the accused to talk when he otherwise would not have done so."). In sum, we scrutinize both "the characteristics of the accused and the details of the interrogation." *Strain,* 779 P.2d at 225 (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)).

Shortly after his arrest, Singer was driven by two agents of the federal Bureau of Alcohol, Tobacco, and Firearms to facilities in Salt Lake City. Singer was given a form stating the *Miranda* rights and an agent also recited the *Miranda* admonition. He signed the waiver section of the form, indicating he understood his constitutional rights, including the right to remain silent, and agreed to speak with the agents. After a few minutes of questioning, Singer stated that he did not want to discuss the bombing or the siege. The agents honored his request and ceased questioning. The agents then began to converse between themselves about the length and stress of the incident, expressing hopes for a speedy reunion with their families in distant states.[10] Singer then interjected the state-

ment that he was surprised the agents had come to Utah from other states. He commented on the stress and difficulty for his own family, and offered a description of some details of the incident. Without restating the *Miranda* admonition, the agents renewed their questioning. Singer continued to answer their questions.

Singer claims to have been suffering, at the time of the incident, from "clinical depression, which causes people to act"—in his counsel's words—"recklessly." He alleges that federal agents used a subtle form of coercion, to which he was particularly vulnerable. Singer concedes that with another defendant, the agents' interrogation and comments would not have produced an involuntary confession, but adds that his peculiar background and lack of socialization, stemming in part from home education, rendered him uniquely susceptible to subtle coercion and made him extremely gullible. Singer produced extensive expert psychological testimony regarding these claims, although much of the expert's testimony was effectively discredited by the State's own expert.

The essence of Singer's claim of involuntariness is that his free will was overcome by the agents as they conversed regarding their families. The United States Supreme Court, in *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), eschewed a "free will" analysis of voluntariness of confessions. The Court stated that the sole concern underlying the Fifth Amendment is coercive tactics by *government agents. Id.* at 169–70, 107 S.Ct. at 522–24. The Court explained: *"Miranda* protects defendants against govern-

need not address this claim. In *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), the Supreme Court rejected the "overborne will" analysis of voluntariness of a confession. *See* discussion of *Connelly, infra.*

10. Singer claims that his decision to renew cooperation with the agents transporting him was motivated to some degree by a generalized question by one of the agents to the other concerning the history of the Singer clan's clashes with various government agencies. However, the record is far from clear as to any expression of puzzlement over the family's history. During cross-examination, one of the agents stated that

the other had used "words to [the] effect" that he did not understand the "background of the situation." The agent was unable to more precisely recall any comments on the Singer family history. However, the other agent, who had been responsible for asking the questions as his partner took notes of Singer's responses, denied making any comments regarding not understanding the background of the incident.

Both agents testified that Singer acted normally during the drive. They also stated that Singer did not appear to be mentally handicapped in any way, nor did he appear to be particularly distressed or overwrought.

ment coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that." *Id.* at 170–71, 107 S.Ct. at 523–24.

Both Singer and the State vigorously argued their respective positions regarding Singer's peculiar degree of gullibility and his mental state, presenting a battery of testimonial mental health evidence. The trial court determined that Singer's statements were not the product of coercive tactics and were voluntarily made. We find no error in this conclusion. However, our inquiry cannot rest here; we must consider the closely-aligned issue of whether Singer effectively invoked the privilege against self-incrimination, and if so, whether the agents improperly disregarded his assertion of that right when they undertook the conversation that led to Singer's talking again.

### B. Failure to Honor Singer's Decision to Remain Silent

Singer asserts that the agents' discussion about the stress of being separated from their own families is analogous to the well-known "Christian burial speech" addressed in *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), *rev'd on other grounds, sub nom Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). In *Brewer,* detectives transporting an accused child-murderer, whom they knew to be a former mental patient who held deep religious sentiments, conducted a dialogue between themselves concerning the indecency of the child victim not receiving a Christian burial. Through this subtle manipulation the detectives successfully enticed the defendant to reveal the location of the body. The Court condemned the use of this interrogative technique and held it to be violative of the Sixth Amendment since the defendant was represented by counsel at the time of the confession.

Despite Singer's religious beliefs and claimed mental limitations, we find the circumstances of the conversation between the two agents more closely aligned with the events in *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Innis was arrested shortly following the robbery of a cab driver by means of a sawed-off shotgun. While driving the suspect to the police station, three officers conversed about the proximity of the arrest to a school for handicapped children. One officer commented that tragedy would ensue if a handicapped child were to find the loaded shotgun, which had been presumably abandoned near the arrest scene and had not yet been located. Innis told the officers to turn the car around and he would show them where the shotgun was hidden. *Id.* at 294–95, 100 S.Ct. at 1686–87. Innis challenged the admission of the shotgun at trial, relying on the Supreme Court's decision in *Brewer.*

In *Innis,* concerned that *Miranda*'s proscription against coercive interrogation might be read too narrowly, the Court took the opportunity to refine the definition of "interrogation" as envisioned in *Miranda.* The Court cited several indirect forms of interrogation, such as contrived lineups, reverse lineups, and blame-transfer techniques, as discussed in *Miranda,* and noted that *Miranda* protections extend "not only to direct questioning, but also to its 'functional equivalent.'" *Innis,* 446 U.S. at 300–01, 100 S.Ct. at 1689. The "functional equivalent" of interrogation was defined as including "any words or actions on the part of the police ... that the police should know are *reasonably likely to elicit an incriminating response* from the suspect." *Id.* at 301, 100 S.Ct. at 1689–90 (emphasis added). Although the question of whether a statement or comment is reasonably likely to evoke an incriminating answer is an inquiry resolved from the perspective of the defendant, *id.,* it must be resolved in light of the officers' knowledge of the suspect's characteristics. *See id.* at 302–03, 100 S.Ct. at 1690–91.

The *Innis* Court concluded that Innis had not been "interrogated" prior to his indication of the location of the shotgun. The Court noted that the conversation included no direct questioning of Innis. *Id.* at 302, 100 S.Ct. at 1690. Nor had Innis been subjected to the "functional equivalent" of interrogation. Unlike the profoundly reli-

gious and mentally ill defendant in *Brewer*, there was no indication that Innis "was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children. Nor [was] there anything in the record to suggest that the police knew that [Innis] was unusually disoriented or upset at the time of his arrest." *Innis*, 446 U.S. at 302–03, 100 S.Ct. at 1690.

 Similar to *Innis*, the conversation between the agents transporting Singer was very brief, comprising only a few sentences of off-hand remarks. Singer claims that because the bombing and siege resulted from difficulties experienced by his own family, the agents' comments about "family" were purposefully intended to be the functional equivalent of interrogation. We disagree. The agents' comments can most fairly be construed in the context of two fatigued officers who had been working long shifts at all hours of the day and night, while separated from spouses and children. Even when generously viewed from Singer's perspective, nothing in the record suggests that the agents' pining for their own homes and families represented anything other than what the trial court concluded it was—the natural expression of familial sentiment.

Singer's decision to relate the story of the siege from his standpoint came within a very few minutes of a full explanation and recitation of his rights, accompanied by his signed waiver. His change of heart followed a brief interpersonal exchange between the two agents—not a lengthy emotional discourse focused toward Singer. The agents honored Singer's request to remain silent and ceased questioning until Singer injected himself into the conversation and voluntarily related his tale. We hold that no violation of Singer's right to remain silent occurred, as Singer voluntarily abandoned his privilege against self-

incrimination under circumstances not amounting to interrogation.[11]

## CONCLUSION

Singer was properly convicted of manslaughter. The evidence presented was sufficient to demonstrate that Singer acted recklessly in firing the shot which killed Lieutenant Fred House. Singer's statements to law enforcement officers were not obtained through coercive interrogation or in violation of the Fifth Amendment. Accordingly, Singer's conviction is affirmed.

BILLINGS and GARFF, JJ., concur.

---

**11.** The State also urges us to follow the rule of *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), where the Supreme Court held that a second interrogation following two hours after the initial invocation of *Miranda* rights, and addressing a crime unrelated to that for which defendant was arrested, did not vio-

late *Miranda* when a new set of warnings was administered. Because we do not find Singer's *Miranda* rights to have been violated we do not reach this issue. However, we note that unlike *Mosley*, Singer was given no second admonition after he initiated conversation with the agents.