**SALT LAKE CITY, Plaintiff and Appellee,**

v.

**Teja Alberta TRUJILLO, Defendant and Appellant.**

**No. 920078–CA.**

Court of Appeals of Utah.

May 27, 1993.

Richard P. Mauro, Salt Lake City, for defendant and appellant.

Stephen P. Zollinger, Salt Lake City, for plaintiff and appellee.

Before GARFF, GREENWOOD and ORME, JJ.

## OPINION

ORME, Judge:

Defendant pled guilty to possession of a controlled substance in violation of Salt Lake City, Utah, Code § 11.24.020 (1987), a class B misdemeanor, but retained her right to appeal the trial court's denial of her motion to suppress. *See State v. Sery,* 758 P.2d 935, 939 (Utah App.1988). Defendant claims on appeal that the affidavit for the warrant on which the search of her residence was based failed to support a determination of probable cause. Alternatively, she contends that if probable cause for a search existed, neither nighttime nor no-knock authority was justified. We affirm.

## FACTS

On March 5, 1991, a magistrate issued a no-knock search warrant pursuant to an affidavit alleging that defendant's residence, located on Salt Lake City's Goltz Avenue, was the locus of ongoing cocaine distribution activities. The warrant specifically authorized permission to search for cocaine, packaging material, drug paraphernalia, currency, records of narcotics sales, and residency papers for alleged illegal aliens living at the premises. The search warrant also authorized police to search the persons of the three residents, one of whom is the defendant in this case. The following day officers executed the warrant by breaking down the door. The search was accomplished during daylight hours, even though the warrant also contained authorization to search at night. Police discovered a small quantity of marijuana, but none of the items described in the warrant.

Because defendant's chief arguments on appeal involve the adequacy of the information supporting the warrant, we recite the information contained in the underlying affidavit in some detail. The investigating officer, Detective Gardiner, supplied the affidavit and based his request for a search warrant upon information obtained through three confidential informants. However, Detective Gardiner personally knew only the first confidential informant (Informant One). He received information from two other informants, Informant Two and Informant Three, through other detectives.

According to the affidavit, Informant One told Detective Gardiner that he had seen two residents of the Goltz Avenue premises, Mario and Garfield, engage in narcotics sales.[1] The affidavit recounted several instances when Informant One participated in controlled drug buys at the Goltz Avenue residence under Detective Gardiner's supervision. One such instance occurred within seventy-two hours of seeking the search warrant. According to Detective Gardiner's sworn statement, each time Informant One executed a controlled purchase at the residence, the informant was searched, provided with cash, and observed entering. After approximately five minutes, Informant One would exit, provide a quantity of cocaine to Detective Gardiner, and undergo another search. The substance purchased tested positive for cocaine each time. According to the affidavit, Informant One told Detective Gardiner that the cocaine was purchased from defendant's roommates, Mario and Garfield, and that defendant was present during some of the transactions.

In addition to the intelligence he received from Informant One, Detective Gardiner detailed information provided by Informants Two and Three, which he received entirely through interviews with other detectives conducting narcotics investigations. Detective Stephens, a Metro Narcotics Strike Force officer who had been conducting a separate investigation of the

---

1. The affidavit did not say where these sales occurred. Testimony elicited at the hearing on the motion to suppress suggested at least some of the sales referred to in this portion of the narrative might have occurred somewhere else.

Any such confusion is not fatal in view of the affidavit's detailed description of Informant One's controlled buys at the Goltz Avenue residence.

Goltz Avenue premises and its residents for about one year, provided information gained from Informant Two. Informant Two told Detective Stephens that Mario and Garfield were illegal aliens who had been dealing large quantities of cocaine from a secluded trailer located in a neighborhood some distance from Goltz Avenue. According to Detective Stephens, Informant Two purchased cocaine from Mario and Garfield. Detective Stephens personally noticed numerous short stay visitors at the trailer. In March 1990, Detective Stephens executed a search warrant in a westside neighborhood. Incident to that search, he interviewed defendant at her residence and noticed narcotics inside.

Finally, Detective Gardiner possessed information from Informant Three, which he received through Sgt. Suarez. According to the affidavit, Informant Three had told Sgt. Suarez that in September of 1990, defendant was distributing cocaine from the Goltz Avenue residence, which the informant described accurately as being a basement apartment located on the east side of a four-plex. Informant Three also told Sgt. Suarez that two illegal aliens lived with defendant, one of whom was named Garfield.

Detective Gardiner also recited several actions taken, in addition to the controlled buys, by which he corroborated information provided by Informant One. Included among these efforts were: (1) a computer and police record search that verified Garfield and defendant lived at the Goltz Avenue residence, (2) an interview with the apartment owner to verify that defendant in fact rented the apartment, (3) a police record check to verify that Garfield was defendant's boyfriend, and (4) a police record search to verify that Informant One's description of defendant matched photographs on file.

Detective Gardiner was the only witness at the hearing on defendant's motion to suppress. Although defense counsel's

questioning initially uncovered apparent inconsistencies between the affidavit and the facts as Detective Gardiner knew them to be at the time he prepared the affidavit, his testimony eventually resolved the inconsistencies. In particular, counsel asked about the statement in the affidavit that Informant One "told your affiant that [Informant One] has observed Garfield and Mario engage in the sales of narcotics." Detective Gardiner acknowledged that sentence did not make specific reference to the Goltz Avenue residence. Upon further questioning, however, Detective Gardiner recounted specific details concerning controlled buys Informant One in fact accomplished at the residence, which buys *were* described in the affidavit. According to Informant One's statements to Detective Gardiner, which were recited in the affidavit, the controlled buys were made from Garfield and Mario, with defendant present in some instances. In context, then, Informant One's observations of narcotics sales by Garfield and Mario might fairly be read as pertaining to the Goltz Avenue residence. But even if other off-site sales are alluded to in the general reference, the key recitation is with respect to recent controlled buys at the Goltz Avenue residence from Garfield and Mario.

Defendant's claims on appeal distill into the following arguments: (1) the affidavit was insufficient to establish probable cause, (2) the circumstances as described in the affidavit failed to justify no-knock or nighttime authorization, and (3) the evidence should be suppressed because the police used false statements to secure the warrant.[2] Because we conclude, in our discussion of the first argument, that the affidavit contained no false statements, we do not separately address the third argument.

## STANDARD OF REVIEW

■ Defendant argues that we should apply a standard affording no special deference to the magistrate, along the lines sug-

**2.** Defendant also argues that the warrant was overbroad. We find this contention without merit and any elaboration unnecessary. *See State v. Carter*, 776 P.2d 886, 888 (Utah 1989)

(nature and extent of an opinion is largely discretionary; appellate courts need not address every issue).

gested in *State v. Weaver*, 817 P.2d 830, 835–36 (Utah App.1991) (Orme, J., concurring). The *Weaver* concurrence speaks of policy and jurisprudential reasons which, in the author's view, lend credence to defendant's assertion that appellate courts should review magistrates' determinations of probable cause nondeferentially.

Establishing the appropriate standard of review normally constitutes a policy decision aimed at allocating power to determine an issue between trial and appellate courts.[3] *State v. Thurman*, 846 P.2d 1256, 1265–67 (1993). In Utah, our Supreme Court has primary responsibility for establishing applicable standards of review by virtue of its authority to manage the appellate process. *Id.* Unless otherwise mandated by Congress or the Supreme Court, state courts possess authority to determine the appropriate standard of review when considering challenges to state trial court determinations made under federal law. *Id.*

The United States Supreme Court has opined that "[a] magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983) (quoting *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969)). The *Gates* Court based its preference for the deferential standard on its belief that a de novo review "is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." *Gates*, 462 U.S. at 236, 103 S.Ct. at 2331. The Court feared that a hypertechnical review of probable cause affidavits would motivate police officers to circumvent the probable cause requirement and instead "resort to warrantless searches, with the hope of relying on consent or some other exception to the Warrant Clause that might develop at the time of the search." *Id.* Accordingly, the Court believed that the deferential standard "bet-

ter serves the purpose of encouraging recourse to the warrant procedure." *Id.* Moreover, this deferential standard has clearly been mandated by the United States Supreme Court for purposes of review under the Fourth Amendment. *Massachusetts v. Upton*, 466 U.S. 727, 732–34, 104 S.Ct. 2085, 2087–88, 80 L.Ed.2d 721 (1984) (reversing Supreme Judicial Court of Massachusetts where court "erred in failing to grant any deference to the decision of the Magistrate to issue a warrant").

Having determined that the deferential standard applies to defendant's claim insofar as premised on the Fourth Amendment, we could adopt the nondeferential *Weaver* standard only under Utah constitutional analysis, and would do so only if adoption of such a standard appeared to be countenanced by the Utah Supreme Court. In *State v. Thurman*, 846 P.2d 1256 (1993), decided after *Weaver*, our Supreme Court reiterated, without any suggestion the approach might be different under the Utah Constitution, that Utah appellate courts review an affidavit supporting a magistrate's determination of probable cause for issuance of a search warrant "in 'its entirety and in a common-sense fashion,'" *id.* at 1260 (quoting *State v. Anderson*, 701 P.2d 1099, 1102 (Utah 1985)), and accord great deference to the magistrate's decision. *Id.* See, e.g., *State v. Babbell*, 770 P.2d 987, 991 (Utah 1989); *State v. Purser*, 828 P.2d 515, 517 (Utah App.1992). The Court indicated the magistrate's decision would be overturned "only if the magistrate, given the totality of the circumstances, lacked a 'substantial basis' for determining that probable cause existed." *Thurman*, 846 P.2d at 1260. *Accord Babbell*, 770 P.2d at 991. Absent any indication the Utah Supreme Court sees merit in the position advanced in the *Weaver* concurrence, we decline to apply a less deferential standard than obtains under the federal constitution as a matter of state constitutional law.

---

**3.** While determining the level of deference that trial or appellate courts should afford a magistrate's conclusion concerning the adequacy of probable cause affidavits does not neatly fit within the framework of allocating power be-

tween appellate and trial courts, it does constitute an analogous allocation of decision making power, between magistrates on the one hand and judges at both the trial and appellate level on the other.

## SUFFICIENCY OF AFFIDAVIT FOR ESTABLISHING PROBABLE CAUSE

### A. Analysis Under Federal Constitution

■ The threshold issue before us is whether the affidavit, when read in a common sense manner, establishes probable cause for issuing a search warrant for the Goltz Avenue residence. Because the police relied almost exclusively on information received from confidential informants, we must determine whether the information they provided forms a substantial basis for the magistrate's determination that probable cause existed. *See Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). *Accord State v. Babbell,* 770 P.2d 987, 991 (Utah 1989).

Prior to *Gates,* the *Aguilar–Spinelli* two-pronged analysis required that an affidavit relying on information received from an informant provide the magistrate with (1) the basis upon which the informant concludes that contraband is to be found at the site to be searched and (2) the basis upon which the affiant believes the informant is credible or that the informant's information is reliable. *Aguilar v. Texas,* 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964). *See Spinelli v. United States,* 393 U.S. 410, 415–16, 89 S.Ct. 584, 588–89, 21 L.Ed.2d 637 (1969). In *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the United States Supreme Court rejected the *Aguilar–Spinelli* approach and announced:

The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id.* at 238, 103 S.Ct. at 2332. In *State v. Bailey,* 675 P.2d 1203, 1205–06 (Utah 1984), the Utah Supreme Court explained the continued role *Aguilar–Spinelli* criteria would play under the *Gates* totality-of-the-circumstances standard. In *Bailey,* the Utah Supreme Court assessed defendant's Fourth Amendment claim under the *Gates* analysis and further explained that in some cases

a showing of the basis of knowledge and veracity or reliability of the person providing the information for a warrant may well be necessary to establish with a "fair probability" that the evidence sought actually exists and can be found where the informant states.

*Id.* at 1205. In other circumstances, however, "a less strong showing of the basis of the affiant's knowledge, veracity and reliability may be required, if the circumstances as a whole indicate that the informant's report is truthful." *Id.* at 1205–06. *See also State v. Anderson,* 701 P.2d 1099, 1101–02 (Utah 1985).

In the case before us, Detective Gardiner relied upon information from three informants, but he knew the identity and had personal contact solely with Informant One.[4] The information provided by Informant One therefore becomes most pertinent in our analysis. Initially, Informant One told Detective Gardiner that he had observed Mario and Garfield engage in narcotics distribution in the past, albeit apparently at other locations.[5] Most important-

---

**4.** Standing alone, the circumstances surrounding the information received from Informants Two and Three could not possibly support a determination that a fair probability existed that contraband would be found at the Goltz Avenue residence. The fact that Detective Gardiner did not even know the identity of these informants presents circumstances that cry out, as per *Bailey,* for particularized showings regarding basis for knowledge and veracity or reliability. This conclusion does not preclude the use of their information, absent such a showing, to bolster Informant One's veracity and reliability.

**5.** Defendant contends that Detective Gardiner made a false statement in his affidavit because at the hearing on the motion to suppress he testified that Informant One had not observed Mario and Garfield distributing narcotics at the Goltz Avenue residence. The alleged false statement reads as follows:

[Informant One] told your affiant that [Informant One] has observed Garfield and Mario engage in the sales of narcotics. [Informant One] also told your affiant that [Informant One] has observed suspect Garfield and Mario use cocaine. [Informant One] further stated

ly, however, Informant One purchased cocaine on several occasions from the Goltz Avenue residence under supervision and observation, to the extent practicable, by Detective Gardiner. According to the affidavit, Informant One told Detective Gardiner that the cocaine was purchased on those occasions from Mario and Garfield and that defendant was present during some of the transactions. One of these buys occurred within seventy-two hours of the affidavit's submission to the magistrate.

Detective Gardiner verified some of the information he received from Informant One through independent sources, namely his interviews with other detectives. These detectives stated that their own informants told them that Mario and Garfield had been distributing narcotics at a different location, but were now living at the Goltz Avenue residence, and that someone at the Goltz Avenue premises was trafficking narcotics. Furthermore, Detective Stephens personally observed the presence of narcotics while talking to defendant at her residence in March 1990. In addition to independent verification he received from other detectives, Detective Gardiner specifically noted in the affidavit other means he pursued to verify the information provided by Informant One, including computer checks of police records to verify defendant's identification and an interview with defendant's landlord to verify her status as a tenant of the Goltz Avenue residence.

> that [Informant One] has observed cocaine being weighed and packaged inside the [Goltz Avenue] premises.
>
> During the hearing on the motion to suppress, Detective Gardiner testified that Informant One had not seen Mario and Garfield sell drugs from Goltz Avenue. On the other hand, he testified in some detail about the controlled purchases that occurred at the Goltz Avenue premises and how Informant One observed cocaine being weighed and packaged at that location during the time of the controlled purchases at that site. Apparently, when Detective Gardiner testified about Informant One not observing narcotics being sold at the Goltz Avenue residence, he was referring to Informant One's observation *prior to* his effecting controlled buys at Goltz Avenue from Mario and Garfield. Under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), in order to receive a hearing concerning the veracity of a sworn affidavit, a defendant

■ Even if we accept defendant's argument that Informant One's reliability was tainted by payments received for controlled buys and search warrants,[6] it appears that Detective Gardiner corroborated Informant One's information to the extent possible, short of accompanying Informant One on the controlled buys. Moreover, repeated controlled buys, carried out under a narcotic officer's supervision and adequately described in an affidavit, ordinarily suffice to establish probable cause for a search of the place where the buys were accomplished. *See, e.g., United States v. Cook,* 949 F.2d 289, 292–93 (10th Cir.1991); *State v. Purser,* 828 P.2d 515, 518 (Utah App.1992). In light of the repeated controlled buys and corroborated evidence in this case, we conclude that under the totality of the circumstances, probable cause existed to justify issuance of the search warrant.

### B. Analysis Under Utah Constitution

Defendant, acknowledging that *Gates* reflects the current federal view, urges this court to adopt, as a requirement of article I, § 14 of the Utah Constitution, the former federal standard for determining whether information obtained from a confidential informant is sufficient to establish probable cause. Defendant argues that *Gates,* which abandoned the rigid *Aguilar–Spinelli* framework and replaced it with a "totality-of-the-circumstances analysis," 462 U.S. at 238, 103 S.Ct. at 2332, is subjective and

must "make[ ] a substantial preliminary showing that a false statement knowingly and intentionally ... was included by the affiant." *Id.* at 155–56, 98 S.Ct. at 2676. While the grammar and structure of the affidavit could be clearer with respect to the location and sequence of observed activities, the juxtaposition of sentences contained in the above quoted section does not support defendant's challenge that the affidavit was based on false statements. Defendant's statement in her brief that Detective Gardiner testified Informant One "never bought cocaine from Garfield or Mario from the premises to be searched" is simply not borne out by careful review of the record.

6. Detective Gardiner revealed at the hearing that he paid $50 to Informant One for each controlled buy and $100 for each search warrant executed.

easily manipulated and provides no guidance by which magistrates can consistently assess affidavits. Contrary to defendant's dissatisfaction with the totality-of-the-circumstances analysis, the Utah Supreme Court has consistently employed the *Gates* standard in evaluating challenges to search warrant affidavits based on the federal constitution without any expressed hesitation or trepidation. *See, e.g., State v. Babbell,* 770 P.2d 987, 991 (Utah 1989); *State v. Espinoza,* 723 P.2d 420, 421 (Utah 1986); *State v. Chambers,* 709 P.2d 321, 324 (Utah 1985); *State v. Anderson,* 701 P.2d 1099, 1101 (Utah 1985); *State v. Romero,* 660 P.2d 715, 719 (Utah 1983) (pre-*Gates* case). *Compare State v. Watts,* 750 P.2d 1219, 1221 n. 8 (Utah 1988) (employing federal analysis of state action requirement for Fourth Amendment, but noting that Utah Constitution might protect citizens from "vagaries of inconsistent" Fourth Amendment analysis); *State v. Lafferty,* 749 P.2d 1239, 1247 n. 5 (Utah 1988) (employing Sixth Amendment analysis, but noting that Utah constitutional analysis might be different if properly presented on appeal); *State v. Mendoza,* 748 P.2d 181, 187 (Utah 1987) (Zimmerman, J., concurring) (noting that Utah constitutional analysis of the good faith exception to warrantless searches might produce a different result than under federal Fourth Amendment); *State v. Hygh,* 711 P.2d 264, 271–72 (Utah 1985) (Zimmerman, J., concurring) (expressing doubt that Utah Constitution is congruent with the "labyrinth of rules built upon a series of contradictory and confusing rationalizations and distinctions" that constitute Fourth Amendment analysis).

Moreover, as explained in *Bailey,* the factors of informant knowledge, veracity, and reliability, which were the linchpin of *Aguilar–Spinelli,* continue to play an important role in disciplined *Gates* analysis, albeit a role which will vary depending on the circumstances of the particular case. Thus, defendant's claim that the *Gates* approach is overly subjective is without merit.

7. In so stating, we acknowledge some state appellate courts have held otherwise in construing provisions of their respective state constitutions.

Accordingly, we decline to hold that the *Aguilar–Spinelli* doctrine is required under the Utah Constitution.[7] *See State v. Rosenbaum,* 845 P.2d 962, 964–66 (Utah App.1993) (noting that the Utah Supreme Court has never chosen to return to the *Aguilar–Spinelli* analysis for the purpose of the Utah Constitution); *State v. Weaver,* 817 P.2d 830, 835 (Utah App.1991) (declining to determine whether Utah Constitution requires *Aguilar–Spinelli* ).

## PROPRIETY OF NO–KNOCK AND NIGHTTIME AUTHORIZATION

Defendant argues that even if probable cause existed for a search of the Goltz premises, the affidavit lacked a sufficient basis for the magistrate to authorize a nighttime, no-knock warrant. No-knock and nighttime authorizations are two separate matters, involving different considerations, and claims of error based on each are assessed independently. *See, e.g., State v. White,* 851 P.2d 1195, 1199–1201 (Utah App.1993); *State v. Rowe,* 806 P.2d 730, 732–35 (Utah App.1991), *rev'd on other grounds,* 850 P.2d 427 (1992).

■ We can easily dispose of defendant's contention that the magistrate improperly authorized a nighttime warrant. The search in question occurred during *daylight* hours. Accordingly, defendant was not prejudiced by the nighttime authorization. *White,* 851 P.2d at 1201.

■ Defendant bases her claim that the magistrate improperly authorized a no-knock search upon Utah Code Ann. § 77–23–10 (1990), which reads in pertinent part, with our emphasis, as follows:

When a search warrant has been issued authorizing entry into any building ... the officer executing the warrant may use such force as is reasonably necessary to enter:

. . . .

(2) Without notice of his authority and purpose, if the magistrate issuing the

*See, e.g., State v. Jacumin,* 778 S.W.2d 430, 435–36 (Tenn.1989); *State v. Jackson,* 688 P.2d 136, 139–43 (Wash.1984).

warrant directs in the warrant that the officer need not give notice. The magistrate shall so direct only upon *proof,* under oath, that the object of the search *may* be quickly destroyed, disposed of, or secreted, or that physical harm may result to any person if notice were given.

Defendant places undue emphasis on the requirement of "proof" that the object of the search may be destroyed if notice is provided. In doing so, defendant ignores the use of "may" with reference to the probability that quick destruction will occur. Under defendant's interpretation, the statute would require "proof, under oath, that the object of the search *will* be quickly destroyed." Such an interpretation would produce an insurmountable burden on police to prove the occurrence of a future event. We accordingly reject defendant's interpretation.

█ Section 77–23–10 allows no-knock authorization if targeted evidence can be easily destroyed or if notice poses danger to anyone.[8] Utah courts recognize a magistrate can reasonably infer, even absent detailed elaboration in the affidavit, that small quantities of narcotics in a residential setting can be easily destroyed. *State v. Rowe,* 806 P.2d 730, 732–33 (Utah App. 1991) (specific facts concerning ready disposability of drugs in routine residential setting need not be detailed in affidavit because "it is not strictly necessary for the officer to elaborate on the obvious"), *rev'd on other grounds,* 850 P.2d 427 (Utah 1992). *See State v. Spisak,* 520 P.2d 561, 563 (Utah 1974); *State v. Purser,* 828 P.2d 515, 518–19 (Utah App.1992); *State v. Miller,* 740 P.2d 1363, 1367 (Utah App.1987). *See also United States v. Moore,* 956 F.2d 843, 850 (8th Cir.1992) ("reasonable ... to assume that suspects selling illegal drugs in small quantities from residence that has normal plumbing facilities will attempt to destroy those drugs if officers knock").

In addition to checking a box on the affidavit which read "the property sought may be quickly destroyed, disposed of, or secreted," Detective Gardiner specifically stated in his affidavit that Informant One told him: (1) the residents always check to see who is at the door before opening it, (2) a bathroom is easily accessible from anywhere in the small apartment, and (3) the suspects store cocaine close to the toilet. Cocaine, even in quantities large enough to provide inventory for distribution, is much more easily disposed of than the full marijuana plants which were held to support no-knock warrants in *Spisak* and *Miller.* *Spisak,* 520 P.2d at 563; *Miller,* 740 P.2d at 1367. Because the affidavit and the nature of the suspected contraband provided an adequate basis to believe notice would endanger successful execution of the warrant, *see* 2 Wayne R. LaFave, *Search and Seizure* § 4.8(d) at 283 (2d ed. 1987), we conclude the magistrate properly authorized a no-knock warrant in this case.

## CONCLUSION

The affidavit in question provided a sufficient basis for the magistrate's determination of probable cause. Even if the nighttime search authority was not proper, defendant was not prejudiced since the search was accomplished during the day. The nature of the contraband and the specific facts delineated in the affidavit justified a no-knock search. We accordingly affirm the trial court's denial of the motion to suppress.

GARFF and GREENWOOD, JJ., concur.

---

**8.** Because we believe the no-knock warrant was justified under the destruction of evidence prong, we need not address whether no-knock authorization was also justified by a reasonable anticipation of physical harm.