**STATE of Utah, Plaintiff and Appellee,**

v.

**Michael W. YODER, Defendant and Appellant.**

No. 950568–CA.

Court of Appeals of Utah.

March 20, 1997.

Linda M. Jones, Lisa J. Remal, and Richard P. Mauro, Salt Lake City, for Defendant and Appellant.

Jan Graham and Kenneth A. Bronston, Salt Lake City, for Plaintiff and Appellee.

Before GREENWOOD, JACKSON and ORME, JJ.

JACKSON, Judge:

Defendant Michael W. Yoder appeals his convictions for child kidnaping, a first degree felony, in violation of Utah Code Ann. § 76-5-301.1 (1995), and aggravated sexual abuse of a child, a first degree felony, in violation of Utah Code Ann. § 76-5-404.1 (1995). We affirm.

### FACTS [1]

On October 21, 1993, around 6:30 p.m. at a West Valley City apartment complex, five-year-old S.F. left her apartment to take some trash to a dumpster about thirty feet from her apartment door. When S.F. failed to return after a few minutes, her mother began searching for her and then called the police to report that she was missing. About one-half hour later, Officer Robert Idle of the West Valley City Police Department arrived at the apartment complex to investigate S.F.'s disappearance.

Officer Idle first met with S.F.'s mother and conducted a preliminary search of the family's apartment and other nearby places where S.F. may have wandered. When this preliminary search uncovered nothing, Idle began a door-to-door search of building I, the building in which S.F. lived, and a search of the perimeter of the apartment complex, followed by a general search from building to building. Two other officers and about fifteen residents of the complex assisted Idle in this search.

Within the next several hours, the search was joined by all detectives of the West Valley City Police Department and numerous agents of the Salt Lake City and Salt Lake County Police Departments, and all the surrounding areas of the complex were searched. During this period, a crowd also gathered at the complex.

About three hours after S.F. had first disappeared, S.F.'s clothes were found in an area that had already been searched by the police. The clothes were located between a sidewalk and a small pond, about twenty feet from building K, the building in which defendant lived. There were no reports indicating how or by whom the clothes had been placed or thrown there.

---

1. We recite the facts adduced at the suppression hearing in the light most favorable to the trial court's ruling. *See State v. Delaney,* 869 P.2d 4, 5 (Utah.Ct.App.1994).

The officers first searched the pond but found nothing. They then turned to building K, as this building was closest to where the clothes were found. Building K has six apartments with balconies facing the area where the clothes were found, with two apartments on each of the building's three floors. Lights were on in only two of these apartments, one of which was defendant's second floor apartment.

A number of unidentified people reported to the police that they had seen defendant "acting suspicious," going back and forth numerous times between his apartment and his balcony and the balcony closet, and standing on the balcony watching the crowd below. A few of the officers also saw defendant both standing on his balcony and going back and forth between his apartment and his balcony.

The police decided to check all the apartments in building K. Detective Alan Call and Officer John Pearce were told to search the building, starting with defendant's apartment. They were instructed to ask defendant if he had seen anything concerning the clothes and to seek his consent to search his apartment.

Thus, the two officers, followed shortly thereafter by Detective Vince Garcia, went to defendant's apartment and asked defendant if they could enter his apartment, explaining that they were looking for a five-year-old girl. Defendant opened the door and stepped back, allowing the officers to enter six-to-eight feet inside the apartment. The officers asked defendant if he knew anything about a missing five-year-old girl. In response to the officers' inquiry about S.F. and their questions as to whether he had seen anything, defendant claimed to have been sleeping and to have just awakened. The officers observed that defendant appeared unusually nervous and agitated.

The officers then explained to defendant that the child had been missing for several hours, that her clothes had been discovered near his apartment building, and that they would like to look at his balcony to see if there might be other items there. Defendant refused to allow the officers to search his apartment or balcony. The officers further explained the urgency of finding a small girl who was probably without clothing, again asking for defendant's cooperation. Defendant again refused to allow them to search and told them they would need a warrant if they wanted to search his apartment. Defendant also asked the officers to leave his apartment, but they refused.

Within five to fifteen minutes after the officers had arrived, defendant said he would not cooperate with the West Valley police because of some prior incident, but said he would cooperate with the Salt Lake County Sheriff. Accordingly, Officer Pearce left the apartment to communicate this to the officer in charge. Meanwhile, the officers who stayed in the apartment continued to "explain the urgency of their inquiry" and to "plead or request that [they] be allowed to find the child." Again, defendant refused to allow a search of his apartment and insisted that the officers leave.

A few minutes later, Officer Pearce returned to defendant's apartment with Salt Lake County Deputy Sheriff Kenneth Eyre. Deputy Eyre introduced himself to defendant and explained that the officers were not there to search for drugs or weapons or anything of that nature, but that they were just trying to find a little girl to make sure that she was all right. Eyre said to defendant, "As a possible father or brother ... wouldn't you want to help somebody find their little girl?" Defendant answered, "No," a response Eyre found odd "considering the circumstances."

In the course of the officers' requests to search the apartment, defendant vacillated back and forth four or five times, indicating at times that he would be cooperative and then refusing to cooperate. At one point after Deputy Eyre's arrival, defendant said he was going to call his attorney. He instead called 911, telling the dispatcher that there were four trespassers—three West Valley City police officers and a Salt Lake County deputy—in his apartment, and asking that they be removed. The dispatcher recommended that he cooperate with the officers.

Deputy Eyre then drew defendant aside and suggested that just he and defendant go out and search the balcony, without the West

Valley officers being involved. Defendant agreed, but said he wanted the West Valley officers to leave. The West Valley officers retreated to the apartment's doorway where they could see Eyre to ensure his safety. Defendant then led Eyre out onto the balcony.

Once on the balcony, defendant went directly to the balcony closet. Defendant briefly opened the closet door about three or four inches and then shut it, saying something to the effect of, "See, there's nothing out here." Deputy Eyre made a cursory search of the rest of the balcony, and then asked that defendant go back into the apartment before him. Defendant at first refused, but then went ahead. As soon as defendant reached the sliding glass door, Eyre turned to the closet and opened the closet door. There he saw S.F. huddled in a box and covered by a blanket. She did not move, and Eyre believed at first that she was dead.

Deputy Eyre immediately arrested defendant, pushing him back into the apartment and handcuffing him. Defendant at this point made a number of comments, including: "You know why I couldn't let you look, because she was here"; "I didn't hurt that little girl very bad"; and, "Just shoot me now, I'm sick." At this same time, other officers entered the apartment to remove S.F. from the closet. They found that she was naked and bound with tape in a fetal position.

Later, it was learned that while the police had searched for S.F., defendant had, over a period of about four hours, removed his clothes and stripped S.F. naked; bound her from head to foot with tape; held her upside down by her feet and flushed her head in the toilet; slapped her; penetrated her anus and vagina with a blunt object, forcefully enough to cause extensive bruising; and forced her to touch his own penis and buttocks with her mouth. In addition, defendant threatened to kill S.F., her mother, and her mother's unborn child if S.F. was not quiet.

Defendant was subsequently charged with child kidnaping and aggravated sexual abuse of a child. Defendant filed a motion to suppress all evidence gathered by the police in the warrantless search of his balcony and a motion to suppress incriminating statements made to police at his apartment after his arrest and statements made to Officer Idle while being transported from the police station to jail. The trial court denied defendant's motions, concluding that defendant consented to the warrantless search of his balcony and that the search was supported by probable cause and exigent circumstances. The court also found that defendant's incriminating statements made to Officer Idle were admissible because they were not the result of custodial interrogation.

Defendant entered a plea of "guilty and mentally ill," conditioned on his ability to appeal the trial court's denial of his motions to suppress. He was then referred to the Utah State Hospital for mental evaluations. Following the sentencing hearing, and after having reviewed the evaluations of defendant's mental status, the trial court found that defendant was not "mentally ill" as defined by Utah law and thus did not qualify for "guilty and mentally ill" status. The trial court sentenced defendant to serve concurrent terms of fifteen-years-to-life for the child kidnaping offense and nine-years-to-life for the aggravated sexual abuse offense.

On appeal, defendant challenges the trial court's denial of his motion to suppress evidence arising from the warrantless search and his motion to suppress his incriminating statements. He also challenges the trial court's finding that he is not mentally ill, and the sentences imposed by the trial court.

## ANALYSIS

### I. Legality of Warrantless Search

Defendant first asserts the trial court erred in denying his motion to suppress all evidence arising from the warrantless search of his balcony. Defendant argues the warrantless search of his balcony violated both the Fourth Amendment of the United States Constitution and article I, section 14 of the Utah Constitution.

The trial court denied defendant's motion to suppress the evidence gathered by the officers during the warrantless search on the grounds that (1) exigent circumstances and probable cause justified the warrantless

search, and (2) defendant consented to the search of his balcony. We first consider whether the search was justified by probable cause and exigent circumstances.

### A. Warrantless Search under the Federal Constitution

■ A warrantless search of a residence is constitutionally permissible where probable cause and exigent circumstances are proven. *See State v. Ashe,* 745 P.2d 1255, 1258–59 (Utah 1987); *City of Orem v. Henrie,* 868 P.2d 1384, 1388 (Utah.Ct.App.1994). "Warrantless entries are justified with *probable cause* and exigent circumstances because in such circumstances, the delay to obtain a search warrant would risk 'physical harm to the officers or other persons, the destruction of relevant evidence, [or] the escape of the suspect.'" *State v. Beavers,* 859 P.2d 9, 17 (Utah.Ct.App.1993) (citation omitted). However, when a private residence is involved, the State's burden in proving probable cause and exigent circumstances is "'particularly heavy.'" *Henrie,* 868 P.2d at 1388 (citation omitted); *see also Beavers,* 859 P.2d at 13. This elevated burden is a result of the "heightened expectation of privacy" that citizens enjoy in their own homes. *Beavers,* 859 P.2d at 13; *see also United States v. United States Dist. Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972) (stating that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed").

■ Defendant does not challenge the trial court's determination that exigent circumstances existed in this case.[2] Instead, defendant challenges only the trial court's determination that there was probable cause to justify the warrantless search. Defendant argues the objective facts observed by the officers did not give rise to an inference that he was engaged in criminal conduct. He asserts that the police officers were acting merely on "hunches" and "premonitions," which are insufficient to support a finding of probable cause.

■ In general, "[p]robable cause means a 'fair probability that contraband or evidence of a crime will be found.'" *State v. Nguyen,* 878 P.2d 1183, 1187 (Utah.Ct.App. 1994) (citation omitted). More specifically, the Utah Supreme Court has defined probable cause as follows: "Probable cause exists where 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a [person] of reasonable caution in the belief that' an offense has been or is being committed." *State v. Dorsey,* 731 P.2d 1085, 1088 (Utah 1986) (quoting *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949)).

■ The probable cause determination is based on "the totality of the circumstances." *See Nguyen,* 878 P.2d at 1187. This court reviews the trial court's determination of probable cause for correctness, giving the trial court a measure of discretion "to apply the standard to the particular set of facts in the case." *Id.* at 1186; *see also State v. Poole,* 871 P.2d 531, 533 (Utah 1994). We review the trial court's underlying factual findings for clear error. *See Poole,* 871 P.2d at 533.

■ At the suppression hearing, the officers involved in the search testified that primarily three factors led them to initially approach defendant. First, the victim's clothes were found in an area that had previously been searched and to which defendant's apartment building was closest. Second, defendant's apartment was one of the two apartments in that building that had the interior lights on, and the other lighted apartment was on the other side of the building, farther from the clothes. Third, the police received reports from "quite a few" citizens that defendant had been standing on his balcony watching the gathering crowd below; going back and forth between his apartment, balcony, and balcony closet; and

---

2. Exigent circumstances are those "'that would cause a reasonable person to believe that entry ... was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.'" *State v. Beavers,* 859 P.2d 9, 18 (Utah.Ct.App.1993) (quoting *United States v. McConney,* 728 F.2d 1195, 1199 (9th Cir.1984)).

"acting very suspicious" and looking nervous.[3] In addition to the reports from citizens, several officers also observed defendant standing on his balcony and going back and forth between his apartment and his balcony. Defendant's apartment was also the only apartment in the building in which human activity had been seen. These factors led the officers to begin their search of defendant's apartment building by checking defendant's apartment.

When the officers contacted defendant, his behavior further validated their suspicions. Two officers testified that when they first entered defendant's apartment and asked him if he had any information that could help them locate the missing child, defendant claimed that he had been sleeping and had just awakened. Defendant's statement that he had been sleeping conflicted with both the officers' impressions upon viewing him and the reported observations of citizens and officers who had seen defendant on his balcony shortly before. In addition, the officers testified that, in response to their explanations of the purpose of their presence and their requests to search his balcony, defendant was evasive, unresponsive, and uncooperative. They also testified that defendant appeared to be very nervous, and that he was agitated and perspiring profusely.

■ Defendant correctly points out that a suspect's nervous behavior alone is insufficient to establish probable cause. In *State v. Potter*, 860 P.2d 952 (Utah.Ct.App.1993), this court considered whether officers' observations that the occupants of the defendant's trailer repeatedly peered out of the window and appeared nervous were sufficient to alone support a finding of probable cause. This court stated: "We have previously held that an 'officer's mere conclusion regarding defendant's nervousness, unsupported by relevant objective facts, can have no weight in determining if he had a reasonable suspicion of criminal activity.'" *Id.* at 957 (quoting *State v. Sery*, 758 P.2d 935, 945 (Utah.Ct. App.1988)). Therefore, this court concluded that "[b]ecause nervous behavior alone is insufficient to establish a reasonable suspicion of criminal activity, it follows that it is clearly insufficient to establish probable cause." *Id.*

■ Although defendant's nervous or suspicious behavior is insufficient by itself to establish probable cause, it may, as indicated by *Potter*, be considered in conjunction with other relevant and objective facts. In addition, this court has stated that "a suspect's 'false or evasive' answers to police questions in conjunction with highly suspicious behavior may be used to establish probable cause." *Nguyen*, 878 P.2d at 1187 (quoting *State v. Menke*, 787 P.2d 537, 542 (Utah.Ct.App. 1990)). "Thus, 'responses by the suspect which the officer knows to be false, or which

---

3. Defendant argues the police improperly relied on unverified reports from "unidentified sources" that defendant was "acting suspicious." Defendant suggests that because the State failed to prove the credibility of these sources or establish that the sources had observed objective facts to support an inference that defendant was engaged in criminal conduct, these reports could not be considered by the police or by the trial court in determining whether there was probable cause to search defendant's balcony. In support of this argument, defendant cites *State v. Case*, 884 P.2d 1274 (Utah.Ct.App.1994), in which this court held that reasonable suspicion for an automobile stop may not be founded solely on an unverified anonymous tip. *Id.* at 1278–79. Defendant asserts that if an unverified anonymous tip is insufficient to support reasonable suspicion, it is necessarily insufficient to support a finding of probable cause.

However, in determining that there was probable cause to search, the police and the trial court in this case were not relying solely on citizen reports of defendant's behavior; instead, this was only one factor supporting the probable cause determination. In addition, the reports of defendant's behavior were partially verified by several officers who also saw defendant standing on his balcony, as well as walking back and forth between his apartment and balcony. Further, even if the reports were not verified or the reliability of the sources confirmed, this court has stated that with citizen informants, as distinguished from police informants, proof of the informant's reliability and veracity is not typically required. *See State v. Purser*, 828 P.2d 515, 517 (Utah.Ct.App.1992) (stating "reliability and veracity are generally assumed when the informant is a citizen who receives nothing from the police in exchange for the information"); *State v. Brown*, 798 P.2d 284, 286 (Utah.Ct.App.1990) (stating that citizen informer is not type of informer that requires independent proof of reliability or veracity because "unlike police informers, citizen informers volunteer information out of concern for the community and not for personal benefit").

are implausible, conflicting, evasive or unresponsive may well constitute probable cause when considered together with the prior suspicions.'" *Id.* (quoting 2 Wayne R. LaFave, *Search and Seizure* § 3.6(f), at 65–66 (1987) (footnotes omitted)). Here, defendant's nervous and suspicious behavior and responses when approached by the police were not solely relied on to establish probable cause. Thus, it was not improper for the trial court to consider defendant's behavior as a factor in determining whether probable cause existed to search defendant's balcony.

We conclude that the trial court correctly determined that, under the totality of the circumstances, the officers had probable cause to conduct a warrantless search of defendant's balcony. Defendant's demeanor and his uncooperative, false, and evasive responses, considered in conjunction with the prior facts observed by the officers that connected defendant and defendant's apartment to the victim's clothing, were sufficient to warrant a person of reasonable caution to believe that defendant was involved in criminal activity or that evidence of a crime would be found in defendant's apartment or on his balcony.[4]

### B. Warrantless Search under the Utah Constitution

Defendant also argues that the warrantless search of his balcony violated the Utah Constitution. Defendant asserts that article I, section 14 of the Utah Constitution provides greater protection against unreasonable searches and seizures than the Federal Constitution. In arguing the Utah Constitution provides greater protection than its federal counterpart, defendant primarily relies on a discussion of the historical background of the State of Utah, and provides little analysis of how article I, section 14 should be interpreted by this court and applied to the facts of this case. Defendant appears to argue that this court should reject the "totality of the circumstances" standard for making probable cause determinations under the Utah Constitution, citing an Alaska case, *State v. Jones,* 706 P.2d 317 (Alaska 1985), in support. In *Jones,* the Alaska Supreme Court, in interpreting a provision in the Alaska Constitution similar to article I, section 14 of the Utah Constitution, refused to adopt the current federal "totality of the circumstances" test[5] for determining whether an affidavit supporting a search warrant is sufficient to establish probable cause under the Alaska Constitution. *See id.* at 324. Instead, the Alaska court retained the former federal standard, the *Aguilar–Spinelli* doctrine, which required the affidavit to set forth sufficient underlying circumstances to establish both (1) the basis of the informant's knowledge, and (2) the informant's veracity and reliability. *See id.* at 321; *see also Illinois v. Gates,* 462 U.S. 213, 228–29, 103 S.Ct. 2317, 2327, 76 L.Ed.2d 527 (1983).

Relying on this Alaska case, defendant apparently urges this court to adopt something analogous to the *Aguilar–Spinelli* test for reviewing all probable cause determinations under the Utah Constitution. Defendant asserts that under such an approach, the court would have to give "individual consideration" to every factor relied on in making the probable cause determination rather than considering these factors in toto. Defendant further asserts that, under this approach, to show probable cause the State "must prove that the objective facts supported an inference that the suspect was involved in criminal conduct, *and* [must prove] the credibility of the source."

This court has previously refused to reject the totality of the circumstances test under article I, section 14 of the Utah Constitution.

---

4. Because we conclude the trial court correctly determined that probable cause and exigent circumstances justified the warrantless search, we need not address defendant's argument that the trial court erred in finding that he voluntarily consented to the search. We likewise need not address the State's alternative argument that the warrantless search was justified under the emergency doctrine.

5. In *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the United States Supreme Court abandoned the *Aguilar–Spinelli* two-pronged test for determining whether an affidavit supporting a search warrant is sufficient to establish probable cause under the Federal Constitution. Instead, the Court adopted a "totality-of-the-circumstances test." *Id.* at 238, 103 S.Ct. at 2332.

*See State v. Lee,* 863 P.2d 49, 57 (Utah.Ct. App.1993) (declining to reject totality-of-the-circumstances test and make *Aguilar–Spinelli* doctrine a standard required by Utah Constitution in examining affidavits supporting search warrants); *State v. Singleton,* 854 P.2d 1017, 1021–22 (Utah.Ct.App.1993) (refusing to reject totality-of-the-circumstances test, and stating that both Court of Appeals and Utah Supreme Court have expressed preference for totality-of-the-circumstances test when reviewing probable cause determinations); *Salt Lake City v. Trujillo,* 854 P.2d 603, 608–09 (Utah.Ct.App.1993) (declining to hold that *Aguilar–Spinelli* doctrine is required under Utah Constitution, and noting that Utah Supreme Court has consistently employed totality-of-the-circumstances standard "without any expressed hesitation or trepidation" in evaluating challenges to search warrant affidavits under Federal Constitution).

■ Defendant has not provided any persuasive argument for reconsidering this issue. Further, defendant has not provided

sufficient analysis for this court to determine, were we to reject the totality-of-the-circumstances test, exactly what test should be adopted under article I, section 14 of the Utah Constitution, and how such a test would be applied to this case. We thus decline again to reject the totality-of-the-circumstances test in reviewing probable cause determinations under article I, section 14 of the Utah Constitution.[6]

## II. Admission of Defendant's Incriminating Statements

Defendant also argues that the trial court erred in refusing to suppress incriminating statements made by defendant to Officer Idle while being transported from the police station to jail.[7] Defendant argues that these incriminating statements, which were recorded, were the result of police interrogation in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[8] Defendant asserts that Officer Idle elicited incriminating statements from him by engaging in conversation and making comments

6. We also note that, although defendant did state before the trial court that the Utah Constitution provides greater protection against unreasonable searches and seizures than the Federal Constitution, defendant did not provide sufficient argument and analysis for the trial court to make such a determination. As in his argument before this court, defendant primarily relied on an account of this state's unique history in its arguments before the trial court.

Defendant also presented a different state constitutional argument before the trial court than he now presents before this court: Before the trial court, defendant argued that the Utah Supreme Court has narrowed the exceptions to the warrant requirement under the Utah Constitution, and that there was no recognized exception in this case to justify the police entry. We have previously stated that "[e]ven though the Utah Constitution is subject to [analysis independent from that of the Federal Constitution], argument for such interpretation generally should begin in the trial court." *State v. Buford,* 820 P.2d 1381, 1384 (Utah.Ct.App.1991). Thus, this court has declined to consider Utah constitutional arguments not adequately presented to the trial court, because " '[n]ominally alluding to such different constitutional guarantees without any analysis before the trial court does not sufficiently raise the issue to permit consideration by this court on appeal.' " *Id.* (citation omitted).

7. Defendant additionally argues the trial court erred in failing to suppress statements made by defendant after his arrest while being hand-

cuffed. These statements are: "You know why I couldn't let you look, because she was here"; "I didn't hurt that little girl very bad"; and, "Just shoot me now, I'm sick." Defendant argues that these statements should have been suppressed by the trial court as "fruit of the poisonous tree" stemming from the alleged illegal search of defendant's balcony. *See Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). However, because we have concluded that the warrantless search was justified by probable cause and exigent circumstances, the trial court did not err in refusing to suppress these statements on this basis.

8. Defendant also argues that the incriminating statements should have been suppressed because the statements were made following unheeded requests for counsel, violating defendant's Fifth Amendment right against self-incrimination. However, defendant failed to preserve this issue below, and we therefore decline to consider it. *See State v. Anderson,* 789 P.2d 27, 29 (Utah 1990) (holding defendant cannot assert, as basis of error on appeal, issue not raised before trial court, even though defendant's claim involves constitutional right); *State v. Webb,* 790 P.2d 65, 77 (Utah.Ct.App.1990) ("As the Utah appellate courts have reiterated many times, we generally will not consider an issue, even a constitutional one, which the appellant raises on appeal for the first time.").

that the officer should have known were reasonably likely to elicit incriminating statements. The State in response argues that the trial court correctly determined that defendant's statements to police were not the product of "custodial interrogation," and thus did not trigger the protections of *Miranda*.

The recorded portion of the conversation between defendant and Officer Idle is as follows:

Yoder: I've spent 25 or 30 years staying drunk trying to (inaudible) I have never hurt anybody in my whole life, and I don't mind telling you (inaudible).

Idle: (inaudible)

Yoder: It would sure make me feel better. (inaudible) when I started feeling bad, probably kept a lot of other things from feeling bad. By the way I have a little nine year old little girl.

Idle: Do ya? I sure would hate to see something like that happen to her.

Yoder: Yes sir, I sure would, I sure would. Reckon you could pull over right here and shoot me.

Idle: No, I can't do that.

Yoder: It would save a lot of money, save a lot of trouble, it would make a lot of people happy.

Idle: Well that would make a lot of people happy, but—

Yoder: I don't know if you know what I am saying. I really can't believe this. I have spent a lifetime trying to avoid this, and I really can't (inaudible).

Idle: Well it certainly wasn't a very nice thing that happened (inaudible).

Yoder: Well it happened to me many years ago, and (inaudible), I could never do that to a child, I could never do that. I hurts so bad, and now this other person is going to have to spend a lifetime feeling, (pause) when I tell you to pull me over and shoot me is partially to put me out of my misery. (inaudible) sick, (inaudible) and this thing happened for no reason, I got no joy out of it, I really didn't. Where in the hell, (inaudible).

Idle: Well I guess that it is up to the individual. I'm just glad that we got it stopped before it had a worse outcome.

Yoder: Oh man I am too, oh man I am too. I may talk to somebody but I am not going to talk you because (inaudible), so I may talk to somebody about it. (inaudible) and I'm, and that's, I was just dumb enough to get caught the first time, but usually people don't get caught the first time because they are careful. It's like shoplifters they don't get caught the first time because they are careful, they say oh this is the first time, sure, you got caught because you got careless. Well I was stupid the first time, I don't know if I was stupid or I couldn't handle it. I think that I wanted to get caught, but I didn't want. (inaudible) but I wanted to get caught, hell I don't know man. It's madness, this thing and it's not just for the children, it's madness, it's pornography (inaudible). I don't know what to (inaudible). (inaudible) I want to kill myself. I been trying for years, and I have kept myself from (inaudible), just because I hated it so much. Why would you do something that you hate so much.

Idle: (inaudible)

Yoder: Just like drinking, I hate drinking, why the hell do I do it so much. You know?

Idle: I don't know, I don't know why anybody would do something like this I really don't.

Yoder: It's (inaudible), there must be something wrong with me. I know what kind of pain it will cause, and then I do it. If I ever get out of jail that little [girl] will be walking around with a gun and will shoot me, because she [would] probably be twenty years old.

Idle: It's entirely possible.

Yoder: And I wouldn't blame her, I really wouldn't. I didn't rape her but I might as well have. My hell (inaudible), when will it end. I would like to shoot the person that raised me but he is already dead. I already seeked him out and found him dead, a few years back. His name was Cliff (inaudible) in Tennessee, he lived with my mother.

Idle: Is that right.

Yoder: I seeked him out, and they all told me he was dead, so I didn't have anybody that I could go shoot.

Idle: Well I hope that you get some help here.

Yoder: Well I don't mean to lean on your shoulder, and I am not trying to justify anything, because there is no justification for it.... There is nothing that can make it right....

In *Miranda*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444, 86 S.Ct. at 1612. The *Miranda* Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way." *Id.*

In *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court further clarified the meaning of "interrogation." The Court stated:

We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Id.* at 300–01, 100 S.Ct. at 1689–90. The Court further stated that "since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Id.* at 302, 100 S.Ct. at 1690; *see also State v. Hilfiker*, 868 P.2d 826, 830–31 (Utah.Ct.App.1994) (discussing *Innis* definition of interrogation); *State v. Hayes*, 860 P.2d 968, 971–72 (Utah.Ct.App.1993) (same); *Layton City v. Aragon*, 813 P.2d 1213, 1214–15 (Utah.Ct.App.1991) (same).

■ There is no dispute here that defendant was "in custody" when he made the incriminating statements at issue. Therefore, the only question is whether his statements were the product of "interrogation." In reviewing the trial court's denial of defendant's motion to suppress the incriminating statements, we examine the trial court's "underlying factual findings for clear error," and " 'review the trial court's conclusions of law based [on those findings] for correctness.' " *Hayes*, 860 P.2d at 971 (citation omitted).

■ In this case, the police did not initiate direct questioning of defendant. The question, therefore, is whether Officer Idle's responses to defendant's statements were the "functional equivalent" of express questioning, i.e., whether the comments were words or actions the officer should have known were reasonably likely to elicit an incriminating response from defendant.

The State and defendant offer very different characterizations of Officer Idle's comments. The State characterizes Idle's comments as mere "expressions of agreement." The State also points to testimony by Officer Idle that on the way to jail defendant "talked almost constantly." The State argues that this suggests defendant felt impelled to tell his story, regardless of any comments made by Idle. This is consistent with the testimony of other officers concerning defendant's behavior following his arrest. For example, Sergeant Lynn Hanson testified that after defendant had been arrested, and while still in his apartment, defendant continued to make "rambling statements" concerning his predicament, "talking even while I was talking a lot of times." He testified that defendant did not appear to be talking to anyone in particular, but rather "just to us [the officers in defendant's apartment] in general."

Defendant, on the other hand, argues that Officer Idle was "clearly engaging [defendant] in conversation." Although Idle did not question defendant or actively encourage defendant to make incriminating statements,

defendant asserts that Idle's remarks were "meant to play on [defendant's] sympathy or conscience" and were statements of judgment, and as such were interrogation. However, even if we were to accept defendant's argument that comments playing on a suspect's sympathy are "tantamount to interrogation," the recorded exchange between defendant and Idle does not support defendant's assertion that Idle intended to elicit incriminating statements from defendant by playing on defendant's sympathy or conscience.

Defendant also asserts that an officer's "banter" with a defendant relating specifically to the defendant's involvement in the charged crime is the functional equivalent of express police questioning. To support this proposition, defendant cites *United States v. Brown*, 720 F.2d 1059 (9th Cir.1983). However, in *Brown*, the officer did not merely "banter" with the defendant concerning the defendant's involvement in a crime. Instead, the court found that the officer engaged in "inflammatory colloquy" and both expressly questioned and "verbally attack[ed]" defendant, "bait[ing]," "taunt[ing]," and "goading" him to obtain an incriminating response. *Id.* at 1064, 1068. In addition, the court noted that the officer testified that he had in fact intended to elicit incriminating responses from the defendant. *Id.* at 1068. Under these circumstances, the court concluded that the defendant's incriminating responses were not "uninvited volunteer," and should have been excluded under *Miranda* and *Innis*. *Id.* at 1069.

In this case, there is no evidence that Officer Idle actually intended, as did the officer in *Brown*, to provoke incriminating responses from defendant. Likewise, unlike the officer in *Brown*, Officer Idle did not verbally attack defendant, or attempt to "bait" or "taunt" defendant into making an incriminating statement. In addition, as in *Innis*, in which the Supreme Court found there was no interrogation, Idle did not engage in a "lengthy harangue." *Innis*, 446 U.S. at 303, 100 S.Ct. at 1691. Also like *Innis*, there is no evidence that Idle was aware that defendant was "peculiarly susceptible to an appeal to his conscience" or to

other particular types of statements, or that Idle knew defendant was "unusually disoriented or upset." *Id.* at 302–03, 100 S.Ct. at 1690; *see also Hayes*, 860 P.2d at 972; *State v. Singer*, 815 P.2d 1303, 1311–12 (Utah.Ct. App.1991).

Under the circumstances of this case, Officer Idle did not make any comments that he should have known were reasonably likely to elicit an incriminating response, and thus did not engage in the functional equivalent of express police questioning. Therefore, we affirm the trial court's determinations that there was no custodial interrogation and that the incriminating statements need not be suppressed.

### III. Mental Illness Determination

Defendant also challenges the trial court's finding that he was not mentally ill and thus did not qualify for the status of "guilty and mentally ill" under Utah Code Ann. §§ 77–16a–103 and –104 (1995 & Supp.1996).

Section 77–16a–103(1) of the Utah Code provides that, "[u]pon a plea of guilty and mentally ill tendered by a defendant[,] ... the court shall hold a hearing within a reasonable time to determine whether the defendant is mentally ill." *Id.* § 77–16a–103(1). "Mental illness" is defined in § 76–2–305(4), which provides in part: "'Mental illness' means a mental disease or defect that substantially impairs a person's mental, emotional, or behavioral functioning." *Id.* § 76–2–305(4) (1995). To find a defendant guilty and mentally ill, the trial court must conclude that "defendant is currently mentally ill." *Id.* § 77–16a–103(4); *see also id.* § 77–16a–104(1) (stating that upon verdict of guilty and mentally ill trial court must conduct hearing to determine defendant's "present mental state"). Under § 77–16a–104(a), mental illness must be proven by "clear and convincing evidence."

In this case, after the trial court denied defendant's motions to suppress, defendant entered pleas of "guilty and mentally ill" to both offenses. Defendant was then referred to the Utah State Hospital for a mental evaluation, where he was examined by two doctors, Dr. Eric Nielsen and Dr. Nancy B. Cohn. After reviewing the reports of these

doctors and hearing the arguments of counsel at the sentencing hearing, the trial court found that defendant did not qualify for the status of guilty and mentally ill. Defendant argues that these doctors' evaluations showed, as reflected in the trial court's findings, that defendant suffers from depression, has a long history of mood disorder, has symptoms and features of post-traumatic stress disorder, and has a long history of substance abuse. Defendant asserts that these findings provide clear and convincing evidence that he is mentally ill under Utah law, and thus argues the trial court erred in refusing to find him mentally ill.

■■■■ "The trial court's finding that defendant was not mentally ill is a factual determination reviewed on appeal for clear error." *State v. Murphy*, 872 P.2d 480, 481–82 (Utah.Ct.App.1994). Under the clear error standard, this court will not upset the trial court's factual findings " 'unless they are "against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made." ' " *Id.* (citations omitted).

■■■■ In this case, neither doctor specifically found that defendant was "mentally ill" under § 76–2–305(4). Dr. Nielsen stated that defendant does "suffer from a mental illness." He specifically found that defendant has "periodically suffered with depression through the course of his lifetime," although "[h]is current level of depression is likely, in part, due to his impending sentence and loss of freedom." Dr. Nielsen further concluded that defendant has a long history of alcohol and drug abuse, and noted that he is "specifically in need of treatment for his recurrent depression, his substance abuse and his sexual abuse of the child."

Dr. Nielsen also stated, however, that defendant "is not demonstrating any significant psychotic symptoms and is not actively suicidal." He further stated that defendant "very much wants to remain at the State Hospital and is inclined to present himself in a somewhat more pathological fashion than is probably accurate as evidenced in his treatment." Despite his statement that defendant does suffer from "a mental illness," Dr. Nielsen concluded that "[a]ll things considered, *it*

*is the examiner's opinion that he does not meet the criteria spelled out under Utah law to be considered guilty and mentally ill.*" (Emphasis added.)

Dr. Cohn did not specifically state whether defendant is "mentally ill," but did find that defendant was "presently depressed" and has a significant history of dysthymia, "a more chronic and less severe mood disorder." She also stated that defendant has symptoms of anxiety and features of post-traumatic stress disorder, has a long history of alcohol dependence, and meets the diagnostic criteria for "Paraphilia Not Otherwise Specified." In discussing defendant's "present mental status," however, Dr. Cohn stated that neither the defendant's "thought process, nor the content of his thinking is impaired; he is not psychotic." She further found that defendant's depression was well controlled with medication and that he was not presently suicidal.

Given that one of the doctors did not specifically express an opinion concerning whether defendant meets the statutory definition of "mentally ill," and the other doctor specifically concluded that defendant does *not* meet the statutory criteria to be found guilty and mentally ill, it was not clear error for the trial court to refuse to find defendant mentally ill. *See Murphy*, 872 P.2d at 483–84 (holding where evidence of whether defendant was mentally ill was controverted—one of four examiners found defendant not mentally ill—trial court did not abuse its discretion in refusing to find defendant mentally ill); *cf. State v. DePlonty*, 749 P.2d 621, 626–27 (Utah 1987) (holding trial court erred in finding defendant not mentally ill where evidence that defendant was mentally ill was undisputed).

## IV. Sentencing

Finally, defendant challenges his sentences. At sentencing, the trial court found two aggravating circumstances—"the offenses to which defendant entered pleas of guilty were characterized by extreme cruelty and depravity" and "the victim was unusually vulnerable"—and one mitigating circum-

stance—defendant was a good candidate for treatment.

In determining that the offenses were characterized by extreme cruelty and depravity, the court specifically found that "defendant kidnapped the victim, sexually abused her, sodomized her, taped her mouth, face and body, flushed her head in a toilet, slapped her, pulled her hair, threatened to kill her and her family[,] and locked her outside in a closet notwithstanding the lateness of the year and the late time of day," thus exposing her to the cold.

The trial court also found that defendant had a "contributory prior criminal history, which included Disorderly Conduct, Resisting Arrest, Assault with a Vehicle, Malicious Mischief, Setting Fire to Personal Property, Arson, Threats and Lewdness." Based on the contributing criminal history, including the "fairly recent lewdness charge," the trial court refused to find that this was "a single episode." The trial court then found that "the aggravating circumstances outweigh the mitigating circumstances." As a result, the trial court imposed the most severe minimum mandatory sentences for both the sexual abuse offense and the kidnaping offense, the terms to be served concurrently.[9]

■■■ "We review the sentencing decisions of a trial court for abuse of discretion." *State v. Houk,* 906 P.2d 907, 909 (Utah.Ct. App.1995); *see also State v. Nuttall,* 861 P.2d 454, 456 (Utah.Ct.App.1993). "Abuse of discretion 'may be manifest if the actions of the judge in sentencing were "inherently unfair" or if the judge imposed a "clearly excessive sentence." '" *Houk,* 906 P.2d at 909 (citations omitted). This court "may only find abuse 'if it can be said that no reasonable [person] would take the view adopted by the trial court.' " *Id.* (citation omitted).

■■■ Defendant challenges the trial court's determination that, in light of defendant's "contributing prior criminal history,"

this offense was not a "single episode." Defendant argues the trial court erred by failing to consider as a mitigating circumstance the fact that he had no prior history of kidnaping, sexual abuse, or other similar sex-related offenses. However, defendant's argument was effectively rejected by the Utah Supreme Court in *State v. Russell,* 791 P.2d 188 (Utah 1990).

In *Russell,* the defendant argued that the trial court erred because it did not consider his lack of prior history of sex-related offenses as a mitigating factor. *See id.* at 192. The supreme court rejected this claim, holding that, in light of the defendant's extensive criminal history, the trial court did not abuse its discretion by not finding "that defendant had no prior charges or convictions of sexual offenses." *Id.; see also State v. Wright,* 893 P.2d 1113, 1121 (Utah.Ct.App.1995) (holding where trial court noted defendant had extensive history of violent and antisocial crimes, trial court did not abuse its discretion by failing to list as mitigating factor defendant's lack of history of sex-related crimes). Thus, in this case, considering defendant's extensive criminal history, and given the trial court's statement that based on that criminal history it did not consider the present offense as an isolated incident, the trial court did not err in failing to recognize defendant's lack of history of similar sex-related offenses as a mitigating factor.

Defendant also argues that the trial court erred by considering aggravating circumstances inherent in the definition of the offense of aggravated sexual abuse. He argues that the factors identified by the trial court in finding the offense was "characterized by extreme cruelty and depravity" were identified in the information charging defendant as essential elements of the offense of aggravated sexual abuse.

■■■ Defendant is correct in arguing that an aggravating circumstance should not

---

9. Although the trial court stated that it did not find a single episode for purposes of sentencing defendant to the most severe minimum mandatory sentence for aggravated sexual abuse of a child, the trial court did state that "[s]ince the State recommends and it appears to the Court that a single episode was involved, the Court will impose the sentence concurrently." Thus, the trial court did appear to consider the fact that defendant had not previously committed the same offenses for purposes of ordering that the sentences run concurrently, and not consecutively.

be considered by the court if it is inherent in the definition of the charged offense. For example, the Utah Supreme Court has stated that "'although a listed aggravating circumstance is an essential element of the crime of aggravated sexual assault, one convicted of that crime nevertheless cannot be sentenced to a mandatory term greater than that of a middle severity in the absence of *additional* aggravating circumstances.'" *Russell*, 791 P.2d at 192 (citation omitted). However, as the State points out, although the trial court listed some factors inherent in the offense of aggravated sexual abuse of a child (i.e., abuse, kidnaping, and threats to kill),[10] the trial court also listed factors that are not (i.e., sodomizing the victim, taping her mouth and body, flushing her head in a toilet, slapping her, pulling her hair, and exposing her to the cold).

We have previously held that, even if a trial court improperly considered invalid aggravating circumstances, if the trial court found other aggravating circumstances adequate to support the minimum mandatory sentence it imposed, any error in considering the improper aggravating circumstances was harmless. *See State v. Perry*, 899 P.2d 1232, 1242–43 (Utah.Ct.App.1995); *see also State v. Archuleta*, 850 P.2d 1232, 1247–48 (Utah 1993) (holding consideration of invalid aggravating circumstances at sentencing harmless where one or more remaining aggravating factors outweigh mitigating factors). In this case, the trial court did list factors included in the offense of aggravated sexual abuse. However, because the trial court found other valid aggravating factors that outweighed the mitigating factor and that were sufficient to support the sentence imposed by the court, any error committed by the trial court in considering the invalid factors was harmless.

Defendant finally argues the sentences the trial court imposed are disproportionate to sentences imposed in similar cases in this jurisdiction. In seeking a comparative proportionality review of the trial court's sentencing decision, defendant misconstrues Utah law. The Utah Supreme Court has rejected defendants' requests to review the proportionality of their sentences by comparing their convictions and sentences with that of other defendants, and has instead emphasized the individuality of each defendant and each case. *See, e.g., State v. Carter*, 888 P.2d 629, 656–57 (Utah 1995); *State v. Gardner*, 789 P.2d 273, 286–87 (Utah 1989). In this case, defendant has not argued that his sentences are not proportionate to the seriousness of the offenses, or that the sentences are inherently unfair or clearly excessive. Therefore, we reject defendant's argument that his sentences are disproportionate.

## CONCLUSION

The trial court correctly determined that the warrantless search of defendant's balcony was justified by probable cause and exigent circumstances. Thus, the trial court correctly refused to suppress the evidence arising from the search. The trial court also properly refused to suppress defendant's incriminating statements, as they were not the result of custodial interrogation. The trial court's determination that defendant did not qualify for the status of guilty and mentally ill was not clearly erroneous. Finally, the trial court did not abuse its discretion in sentencing defendant to the most severe minimum mandatory sentences for aggravated sexual abuse of a child and child kidnaping. Accordingly, we affirm defendant's convictions and sentences.

ORME, J., concurs.

GREENWOOD, Judge (concurring in the result):

I concur in the result and the reasoning of my colleagues in all respects except as concerns the existence of probable cause to justify the warrantless search of defendant's apartment and balcony. I cannot agree that the totality of the circumstances justifies a conclusion that there was probable cause to believe defendant had committed or was

---

**10.** *See* Utah Code Ann. § 76–5–404.1(3) (Supp. 1996) (stating aggravating circumstances include committing offense during the course of a kid-naping, committing offense by force or threat of harm, and causing bodily injury to victim during or as a result of offense).

**550**

committing a criminal offense. *See State v. Spurgeon,* 904 P.2d 220, 226 (Utah.Ct.App. 1995). However, I believe the search can be validated by application of the "emergency aid doctrine," which provides an exception to the warrant requirement of the Fourth Amendment. The elements of this doctrine are as follows:

> (1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.
>
> (2) The search must not be primarily motivated by intent to arrest and seize evidence.
>
> (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.

*People v. Mitchell,* 39 N.Y.2d 173, 383 N.Y.S.2d 246, 248, 347 N.E.2d 607, 609 (1976). In *Mitchell,* police officers were searching a New York City hotel for a chambermaid reported missing from her assigned location. *Id.* at 247, 347 N.E.2d at 608. The maid's street clothes and partially eaten lunch were discovered, but a four hour search was unsuccessful. Finally, police commenced a room-by-room search. Defendant, to whom officers had earlier talked, said he had not seen the maid, and his room was the last one searched. Police discovered the maid's corpse in defendant's closet. The New York Court of Appeals held that the search "was not interdicted by the Fourth Amendment because it was triggered in response to an emergency situation and was not motivated by the intent to apprehend and arrest him or to seize evidence." *Id.; cf. Provo City v. Warden,* 844 P.2d 360, 364 (Utah.Ct.App.1992) (adopting "imminent danger to life or limb" as criteria to justify community caretaker automobile stop), *aff'd* 875 P.2d 557 (Utah 1994).

In this case, an emergency situation existed because of the missing child, discovery of her clothing, the cold temperature, and the amount of time that had passed since the child's disappearance. Proximity of the clothing to defendant's apartment and the officers' concerns about defendant's behavior and demeanor do not rise to probable cause, in my opinion, but do provide a "reasonable

basis, approximating probable cause," that is, a nexus between the emergency situation and defendant's apartment, to justify the search under the emergency aid doctrine. Additionally, the primary concern at the time of the search was not the arrest of defendant or seizure of evidence, but rather, the life and well-being of the missing child. I would therefore find the search legal under the Fourth Amendment on the basis of the emergency aid doctrine.