**2025 UT App 44**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MILLER E. COSTELLO,
Appellant.

Opinion
No. 20230157-CA
Filed April 3, 2025

Second District Court, Ogden Department
The Honorable Michael D. DiReda
No. 171901546

Freyja Johnson, Emily Adams, and
Hannah Leavitt-Howell, Attorneys for Appellant

Derek E. Brown, Michael D. Palumbo, and William
M. Hains, Attorneys for Appellee, assisted by law
student Rebecca Barker[1]

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and
DAVID N. MORTENSEN concurred.

HARRIS, Judge:

¶1 Miller E. Costello pled guilty to aggravated murder for his role in the abuse-related death of his three-year-old daughter, Ava.[2] Later, after a multi-day sentencing hearing, the district court sentenced Costello to life in prison without the possibility of parole. Costello now appeals his sentence, asserting that the court

---

1. *See* Utah R. Jud. Admin. 14-807 (governing law student practice in the courts of Utah).

2. A pseudonym.

improperly double-counted aggravating factors, failed to adequately consider certain items of mitigating evidence, and generally imposed an inappropriate sentence. We discern no abuse of discretion in the court's sentencing decision, and we therefore affirm.

BACKGROUND

¶2 In July 2017, law enforcement officers were notified of a child who was unconscious and not breathing. Upon responding, officers observed a small child, later identified as Ava, lying on the floor in a virtually empty living room. They quickly determined that Ava was "deceased," and they realized "immediately that this was a criminal scene" and that Ava "did not die of any natural causes." Ava appeared to be "extremely malnourished." Her face was "extremely thin" and "sunken" and had a "bluish-gray color to it." Officers observed "bruises and marks all over" Ava's face, which was "very cold to the touch." Later, officers discovered that Ava had various "bruises and lacerations" all over her body. She had "a large burn on her chest," as well as "smaller circular burns on her back, legs, and feet" that were "consistent with cigarette burns."

¶3 During their ensuing investigation, officers interviewed Ava's parents—Costello and his wife (Mother)—and Mother "admitted to covering [Ava] with make up to conceal some" of her injuries. For his part, Costello acknowledged an awareness that Ava needed urgent medical attention, but he asserted that Ava "was in the sole care of" Mother. Officers searched the parents' cell phones, and they discovered "several pictures and videos which showed Ava's deteriorating health conditions" over a time span of about eighteen months. In the videos, Costello and Mother could be seen taunting Ava by showing her food and then preventing her from eating it. One video shows Costello "using the feet of an infant child to kick [Ava] in the face." In the videos, Ava is in "an obvious state of emotional duress and distress."

¶4 After investigation, the State charged Costello with aggravated murder, citing three aggravating factors: (1) the murder was committed "incident to" the commission of child abuse; (2) the murder "was committed in an especially heinous, atrocious, cruel, or exceptionally depraved manner"; and (3) "at the time of death the victim was younger than 14 years of age."

¶5 Thereafter, a multi-day preliminary hearing was held, at which several officers and experts testified about the severity of the abuse inflicted on Ava. One detective (Detective), specifically trained in investigating child abuse cases, remarked that Ava "looked like a Holocaust victim." A police investigator testified that Ava's "malnutrition reminded [him] of pictures you see of kids in concentration camps." And a medical examiner testified that Ava was "severely malnourished" and that she weighed less than fourteen pounds, placing her in "less than a 1st percentile for body weight." The medical examiner reiterated several times that Ava's injuries were caused by "non-accidental trauma" and that Ava suffered injuries on "pretty much every compartment of her external body." At the conclusion of the preliminary hearing, the district court bound Costello over for trial, and it issued a written decision setting forth its reasoning.

¶6 In the wake of the preliminary hearing, the State filed a notice indicating its intent to seek the death penalty against Costello, and it filed an amended information to that effect. Some time later, Costello entered into a plea agreement with the State, whereunder Costello agreed to plead guilty to aggravated murder and the State agreed to decline to seek the death penalty.

¶7 A few weeks later, the district court held a sentencing hearing, which took place over four days. At that hearing, the State played a recording of a 911 call made by a concerned citizen about five weeks prior to Ava's death. The concerned citizen had been shopping at a clothing store and had been shocked by Ava's malnourished appearance. On the call, the citizen reported that

"[t]he dad"—referring to Costello—"said he would wait" at the store for emergency personnel to arrive. But Costello and Mother took Ava and left the store without waiting for responders.

¶8    During the hearing, the State also discussed how the abuse affected not only Ava but also her older brother (Brother), who not only witnessed the abuse visited upon Ava but was, at times, also forced to participate in it. The State presented a report from Brother's counselor in which the counselor described "some experiences [Brother] went through and continues to struggle with nearly six years later." The report emphasizes that "[Brother] is now almost 10 and continues to have a very clear memory of what torture he witnessed occurring to his sister and what he participated in with the direction of his parents." The report states that, at some point, Brother even "became suicidal due to the grief and guilt he felt."

¶9    Detective testified at the hearing and described the photos and videos found on Costello's phone that "basically documented" the abuse over an eighteen-month period, including videos of Costello and Mother taunting Ava with food and then refusing to give her any. Detective also stated that, for her, this case had been "a career ender," explaining that she had decided to leave police work "because of what [Ava] endured and what [Detective] had to watch her go through." A pediatric physician testified that Ava was old enough to understand "what was happening" when her parents were withholding her food and abusing her. When discussing Ava's weight, the physician testified that Ava "wasn't even on a growth curve for a three-year-old, but she was the same weight as a six-month-old at the time of her death" and that "[h]er malnutrition was beyond a stage that we see in the United States."

¶10   A mitigation specialist (Specialist) testified on behalf of Costello, and she informed the court that Costello "had a very low IQ" and that he had not attended very much school. She also

emphasized that Costello came from a specific culture—which she referred to as "Roma"—in which women are apparently supposed to "teach the younger women how to be mothers" while the men "are supposed to be making money." Specialist stated that, in this culture, "it's almost taboo for a male member to either bathe or change the diapers of a female baby." Specialist also asserted that Costello had strong family support, and she even noted that at one point Costello had placed Ava in the care of his brother and sister-in-law for six months, during which time Ava "thrived, ate everything, gained weight, was loved and was healthy." Specialist also testified that Costello was "deeply addicted" to drugs and was often "buying drugs on the street" or trying to get drugs by visiting "emergency rooms . . . trying to get pain meds." Specialist offered her view that Costello was "naive and easily manipulated," which, in combination with the factors above, created a "perfect storm."

¶11   After the sentencing hearing, the court announced its sentence in a lengthy oral ruling. The court discussed the severity of Ava's injuries at some length; indeed, the sentencing judge offered his view that the abuse Ava suffered was "the most dehumanizing, horrific physical abuse, torture and starvation [he had] seen in 29 years of work in the criminal justice system," and he went on to observe that he had "never experienced this level of depravity, this level of cruelty, this level of evil in any of the cases [he had] handled previously."

¶12   The court discussed the mitigation evidence presented by Specialist, and it specifically noted Specialist's testimony that Costello "was naive and easily manipulated," was "deeply in the throes of addiction," had "low IQ [and] very little socialization," and may have been "brainwash[ed] into believing there was something unfixable about" Ava. The court also mentioned Specialist's testimony about Costello's "family support." But the court was not persuaded that this mitigation evidence was strong enough to warrant a lower sentence. It noted that Costello had a

history of ignoring his family's advice, "so family support may not be sufficient if [Costello] continued to be unwilling to listen to his family." And the court noted Costello's own statement to police that he "knew [Ava] was going to die" and that he "knew what the right thing was to do, but [he] didn't do it." In fact, the court stated that Costello's "own statements and the video and photographic evidence . . . belie the claim that his intellectual challenges have anything to do with his choices and behavior." Indeed, the court found that, despite his low IQ, Costello "was aware of what was occurring, had the ability to intervene and save [Ava], but instead participated with [Mother] in abusing, torturing, and starving [Ava], and bringing about her death."

¶13    The court also noted that Costello had not "shown remorse or taken responsibility for this horrific crime," and it noted that the very people who were supposed to protect Ava—her parents—were the ones who "dehumanized and tortured" her. The court concluded by stating that, in its view, the sentence that was most "proportionate to the gravity of the crime" was "life without the possibility of parole."

ISSUE AND STANDARD OF REVIEW

¶14    Costello now appeals his sentence. We review sentencing decisions deferentially, and we will overturn them "only if it is clear that the actions of the sentencing judge were so inherently unfair as to constitute an abuse of discretion." *State v. Martin*, 2017 UT 63, ¶ 20, 423 P.3d 1254 (cleaned up); *see also State v. Helms*, 2002 UT 12, ¶ 14, 40 P.3d 626 (stating that "sentencing reflects the personal judgment of the court, and consequently, a sentence imposed by the trial court should be overturned only when it is inherently unfair or clearly excessive").

ANALYSIS

¶15　Costello pled guilty to aggravated murder. In this situation, a sentencing court has only two options: "life in prison without parole" (LWOP) or "an indeterminate prison term of not less than 25 years and that may be for life." Utah Code § 76-3-207.7(2). Our supreme court has determined that "[t]he statute's plain language does not contain [a] presumption" in favor of either of these two sentencing options. *Met v. State*, 2016 UT 51, ¶ 118, 388 P.3d 447. "Rather, it is within the court's discretion, after considering and weighing the applicable sentencing factors, to sentence [the defendant] to either an indeterminate term of not less than [twenty-five] years or for a term of life in prison without parole."[3] *Id*. And more generally, in deciding the appropriate sentence, the court should impose a sentence that is "proportionate to the seriousness of" the crime and that "[p]revent[s] arbitrary or oppressive treatment" of the convicted person. Utah Code § 76-1-104. "When read in harmony, these [two statutory] provisions make clear that a sentencing court is to consider all the evidence before it—the totality of the circumstances—in imposing a sentence that is proportionate to the crime and the culpability of the defendant." *State v. Perea*, 2013 UT 68, ¶ 115, 322 P.3d 624.

¶16　Here, Costello takes issue with the district court's choice to sentence him to LWOP rather than to a term of twenty-five years to life. In challenging that decision, Costello claims that the court

---

3. The court in *Met* was applying the 2007 version of the relevant statute; at the time, the statutory alternative to LWOP was a sentence of twenty years to life (as opposed to twenty-five years to life). *See Met v. State*, 2016 UT 51, ¶ 118, 388 P.3d 447 (applying Utah Code § 76-3-207.7 (2007)). In our discussion of *Met*, above in the text, we have modified the quotation to reflect the 2009 statutory change—applicable in this case—increasing the minimum sentence by five years. *See* Utah Code § 76-3-207.7.

abused its discretion by "double-counting" aggravating factors, by not properly considering his mitigating evidence, and by imposing a sentence disproportionate to the crime committed and to his own involvement in it.

¶17 We first address Costello's "double-counting" argument. In summary, Costello contends that "[t]he district court abused its discretion when it used the very circumstances that enhanced the offense from murder to aggravated murder to justify the more severe sentence of LWOP." Costello correctly points out that "an aggravating circumstance should not be considered by the [sentencing] court if it is inherent in the definition of the charged offense." *State v. Yoder*, 935 P.2d 534, 548–49 (Utah Ct. App. 1997). But the district court did not engage in improper "double counting" in this case, for two reasons.

¶18 First, there were *three* applicable aggravating circumstances here, not just one. Under Utah law, "[c]riminal homicide constitutes aggravated murder" if the crime was committed "under *any*" one of the circumstances listed in a particular statute. *See* Utah Code § 76-5-202(1) (2017) (emphasis added). [4] And in this case, the State alleged—and Costello admitted as part of his plea agreement—that Costello committed a murder that qualified as "aggravated" in three different ways: (1) the murder "was committed incident to . . . [a] criminal episode during which [Costello] committed . . . child abuse"; (2) the murder "was committed in an especially heinous" manner; and (3) Ava was "younger than 14 years of age." *See id.* § 76-5-

---

4. Because the relevant statute was substantively amended in 2022, we cite the version of the statute in effect in 2017, at the time the conduct at issue occurred. *See State v. Bryant*, 2012 UT App 264, ¶ 16, 290 P.3d 33 (holding that a defendant is entitled to be sentenced under the version of the statute in effect at the time the crimes in question were committed); *see also* Criminal Code Recodification, ch. 181, § 52, 2022 Utah Laws 1125, 1160–62.

202(1)(d), (r), (t)(i). Any one of those three admitted circumstances, standing alone, would have rendered this homicide "aggravated murder." So even assuming—for purposes of the discussion—that the thing that makes a murder charge "aggravated" can't be considered at all at sentencing, the district court here would have been well within bounds to consider any *two* of the aggravating factors at sentencing.

¶19 But second, and relatedly, it is inaccurate to say that a sentencing court is completely forbidden from considering any of the *facts* underlying the aggravating circumstances, even if it is forbidden from giving additional weight to the aggravated nature of the charge itself. The court here didn't sentence Costello to LWOP simply because he had committed a murder that the law considers "aggravated." Instead, the court sentenced Costello to LWOP because, among other things, the murder had been committed incident to incredibly heinous abuse of a child—his own daughter—who was not merely "younger than 14" but was only three years old. Courts must consider the totality of the circumstances in making sentencing determinations, *see Perea*, 2013 UT 68, ¶ 115, and in doing so a court must be able to assess, for instance, just *how* heinous the crime was. In short, we agree with the State's assertion that there is "nothing improper about [a sentencing] court considering the facts underlying statutory aggravating circumstances as part of the totality of the circumstances informing the court's sentence."

¶20 Here, by considering the severity of the abuse Costello inflicted upon Ava, and by considering how egregious this crime was—after all, witnesses noted, among other things, that Ava's "malnutrition was beyond a stage that we see in the United States"—the district court was properly taking into account the totality of the circumstances; it was not engaging in improper "double-counting."

¶21    Next, we consider Costello's second argument: that the district court did not adequately consider his mitigation evidence, as well as other things like public safety and Costello's capacity for rehabilitation. We reject this argument for two reasons.

¶22    First, Costello's argument is largely unsupported by the record. At the sentencing hearing, Costello presented quite a bit of mitigation evidence, largely through Specialist's testimony. As noted, Specialist informed the court, among other things, that Costello "had a very low IQ" and was "easily manipulated," that he came from a culture that encouraged him to be less involved in parenting female children, and that he was struggling with drug addiction. And she emphasized that Costello had strong family support. In the course of its oral ruling, the district court directly addressed most of this evidence and offered concrete reasons for finding it unconvincing. *See supra* ¶ 12.

¶23    Moreover, the fact that the district court did not make specific mention, in its oral ruling, of each and every piece of evidence Costello offered—for instance, the court did not specifically mention Costello's limited prior criminal history or potential cultural influences—is not grounds for disturbing the sentence. "As a general rule, [appellate courts] presume that the district court made all the necessary considerations when making a sentencing decision." *State v. Moa*, 2012 UT 28, ¶ 35, 282 P.3d 985; *see also State v. Helms*, 2002 UT 12, ¶¶ 11–12, 40 P.3d 626 (refusing to assume that a sentencing court hadn't considered "factors" that it didn't specifically address on the record, and stating that "we will not assume that the trial court's silence, by itself, presupposes that the court did not consider the proper factors"). And here, we decline Costello's invitation to presume that, merely because the court did not mention every item of evidence Costello proffered, it did not appropriately consider that evidence in its totality.

¶24    Finally, we address Costello's third argument: that the district court imposed a sentence that is disproportionate to the crime and to Costello's involvement in it. In this context, a sentencing court has broad discretion to determine which sentence—as between LWOP and twenty-five years to life—is most appropriate under the circumstances. *See Met v. State*, 2016 UT 51, ¶ 118, 388 P.3d 447 ("[I]t is within the court's discretion, after considering and weighing the applicable sentencing factors, to sentence [the defendant] to either an indeterminate term of not less than [twenty-five] years or for a term of life in prison without parole."). In this case, Costello's involvement in the crime was significant. The district court did not abuse its discretion in selecting the sentence, given the gravity of the crime and the totality of the circumstances under which Costello committed it.

## CONCLUSION

¶25    For all of these reasons, we discern no abuse of discretion in either the district court's choice of sentence or in the manner in which the court arrived at the sentence.

¶26    Affirmed.